## BENTLEY *v.* ROBSON.

1. MORTGAGES—EXECUTION—DURESS OF IMPRISONMENT.

A mortgage given by a wife at the instance of her husband, who, unknown to her, had committed a forgery, and thereby defrauded an insurance company, and had, upon its discovery, been required, though ill, to accompany an officer from his house, and, after a consultation with the representative of the company and the prosecuting attorney, in which the latter had suggested that he ask his wife to give a mortgage to the company, had returned home in the custody of the officer, accompanied by the assistant prosecutor, and had told her that she would have to sign the mortgage to save him from jail, and which mortgage was signed by her on this assurance, without her knowing the nature of the charge against him, is void for duress, although no threats were employed by the officers to induce its execution.

2. SAME—RATIFICATION—CONTINUING INFLUENCE.

The taint of duress attaching to the execution of a mortgage is not removed by payments on the mortgage, or other recognitions of it, made under the same influence which controlled its original execution.

3. SAME—EVIDENCE—LIENS.

Where it is contended that a mortgage which was executed by a wife on her property under duress, to save her husband from imprisonment for obtaining money on a forgery, was on property paid for in part with the money so obtained, so as to give the injured party a lien upon it, such fact must be made affirmatively to appear.

Appeal from St. Clair; Eldredge, J., presiding. Submitted June 10, 1898. Decided July 18, 1898.

. Bill by Louisa G. Bentley against William O. Robson, trustee, to set aside a mortgage. From a decree for complainant, defendant appeals. Affirmed.

*Seward L. Merriam,* for complainant.

*Stevens & Graham* (*Avery Bros. & Walsh,* of counsel), for defendant.

MOORE, J. Complainant filed a bill to set aside a mortgage given by her, upon the ground that she was under duress when it was given. The proofs were taken in open court, and a decree was granted according to the prayer of the bill, from which decree the defendant appeals.

The circuit judge filed in the case a written finding of facts, as follows:

" Charles Bentley, husband of the complainant, was for some years prior to the 8th of January, 1897, the secretary of Hope Lodge of the Royal Arcanum of Port Huron, and acting collector, and had, by means of forged proof of the death of one Henry S. Ballentine, procured the allowance by the supreme council of said society of a claim for said sum in favor of the beneficiary, and the forwarding to said Hope Lodge of a draft upon Detroit for $3,000, payable to the beneficiary named, and had forged her name to the indorsement of the draft, and obtained the cash thereon. Henry S. Ballentine was living at the hearing of this cause. Mr. Bentley had also, something over a year prior thereto, by like means, obtained a like sum on the assumed death of one George McPherson, who still lives, but the latter fraud was not known to the defendant at the date of said mortgage. The defendant is the supreme secretary of the supreme council of the Royal Arcanum, and was, shortly prior to the 8th day of January, 1897, advised that the said Henry S. Ballentine was still living, and became advised of the fraud perpetrated by said Bentley. He is a resident of Boston, and came to Port Huron with the forged claims and proofs of death in the Ballentine matter, arriving on the evening of the 7th of January. The next day he submitted to the prosecuting attorney of St. Clair county the evidence that he had of Bentley's fraud, and the prosecuting attorney sent for the sheriff, and directed him to go and get Bentley, and come

to the hotel where he and the defendant were.     This was about noon of that day.     The sheriff went to Bentley's house, where he found Bentley sick, and claiming to be too sick to go.     The sheriff, after a time, made report to the prosecuting attorney of Bentley's sickness, and during the afternoon the defendant, the prosecuting attorney, and a member of Hope Lodge went to Bentley's house, and found him sick.     He admitted the fraud, and pretended he still had $1,500 of the Ballentine money in the bank in the shape of a certificate of deposit in the St. Clair County Savings Bank in his store, and gave to the defendant an order therefor on his son-in-law, then temporarily in charge of the store.     The certificate was not found at the store, and in fact Bentley had cashed it early in the morning of that day, and the $1,500 was then in his bureau drawer at his house.     During the afternoon it was ascertained that Bentley had cashed the certificate, and the sheriff was directed by the prosecuting attorney to bring Bentley to the hotel, where the defendant and prosecuting attorney were.

"During the afternoon the sheriff had kept the house of Bentley under surveillance by himself or deputies; and, on being directed as above stated by the prosecuting attorney, the sheriff and deputy sheriff went to the house of Bentley, arriving there as the family were about to take supper.     Bentley was upstairs in bed, and had been during the afternoon.     The sheriff went upstairs to Bentley, and insisted on his going to the hotel, telling him that he had been instructed to fetch him to the hotel. Bentley claimed to be unable to go; that he was too sick. Thereupon the sheriff went out, leaving the deputy in the house downstairs, and in view of the foot thereof, with directions to stay there until he (the sheriff) should return, and in a short time returned, went upstairs, and came down with Bentley, having his hands upon him.     Bentley being but partly dressed, Bentley's wife and children put on his shoes, necktie, coat, and hat, and the sheriff, with Bentley, then went out, got into a buggy, and drove to the hotel, leaving the deputy to follow on foot.

"At this time the complainant was not informed of the reason why the sheriff was doing as he was, and had no knowledge of the fraud committed.     She had applied to her husband during the afternoon to know why the men were coming there as they were, and what was the trouble, and could get no satisfaction.     She and her sons and daughters were much disturbed and excited when the

sheriff took Bentley away in the buggy. She and the daughters were in tears, and by her direction the son and son-in-law followed the buggy, to see where Bentley was taken. They, running to keep the buggy in sight, saw it stop at the hotel, and the sheriff, with Bentley, go in. Watching the hotel a short time, they left, and on the way home one of them was told by a third party something of the nature of the trouble Bentley was in.

"The deputy sheriff followed to the hotel, and was left there by the sheriff—who went to his supper—to follow such directions as the prosecuting attorney should give him. On arriving at the hotel, Bentley was taken up to the defendant's room, and there, being advised by the prosecuting attorney as to his official position, and that whatever he said would be used against him, was asked where the money was he had drawn from the bank that morning. Bentley then informed the defendant that he had $1,000 in the bureau at home, excusing his course in sending the defendant to the store as being the result of sickness and medicine he had taken. At the time he was sick—quite sick. He lay upon the bed in the room, and vomited once or twice. He announced his willingness to turn over the $1,000. The deputy, who was in the hotel on the same floor as the room in which the parties were, was called in, and directed by the prosecuting attorney to take Bentley to his home, and told that Bentley would get $1,000, and give him, and to return with Bentley to the hotel. The deputy drove Bentley to his house. Bentley went in and upstairs, and returned to the buggy, gave the deputy a roll of bills, and the two got in, and the deputy drove back to the hotel, went to the defendant's room, and there the deputy produced, and there was turned over to the defendant, the roll of bills, which, on being counted, was short of the $1,000. Bentley's attention being called to it, he claimed that he must have dropped it in the drawer of the bureau, and that it was still there.

"Bentley was urged to make restitution of the money he had defrauded the Royal Arcanum of. He was not promised by the defendant or the prosecuting attorney that his doing so would avoid prosecution, but it was represented to him that his doing so would aid him in getting leniency at the hands of the court. He was asked as to the title of his house, and he informed the parties truthfully that the title was and had been in his wife for many years, had been bought in her name, and at the time was free from incumbrances. He was asked if his wife would

help him out, and would give a mortgage for the balance
of the money.    On his reply that he thought she would,
the prosecuting attorney telephoned for a clerk in his
office to come over with a blank mortgage, and the as-
sistant prosecuting attorney, the clerk being absent, went
to the hotel with the blank, and, by direction of the prose-
cuting attorney, Bentley and the assistant prosecuting
attorney were driven to Bentley's house by the deputy
sheriff, who was instructed that Bentley would give him
the shortage above mentioned, and his wife was to exe-
cute a mortgage which the assistant prosecuting attorney
would draw.    On arriving at the house about 8 o'clock p.
m., the assistant prosecuting attorney and Bentley went
in at the kitchen door, and Bentley had some conversation
with his wife, which, it is evident, the assistant prosecut-
ing attorney did not overhear.    Bentley then told his wife
in that conversation, in substance, that she would have to
sign a mortgage on their home, to save his going to jail;
"that there was no other way to avoid it."    On his last
assurance she reluctantly consented to do so; whereupon
Bentley, the assistant prosecuting attorney, and com-
plainant went upstairs to a room where there was a desk,
followed by the deputy sheriff, who had come into the
house.    The deeds to complainant were produced, from
which the assistant prosecuting attorney took the descrip-
tion of the property included in the mortgage, drew the
latter, and the note accompanying the same.    While the
assistant prosecuting attorney was filling out the mortgage,
Bentley went into an adjoining room, and returned soon
with the shortage above mentioned, and handed it to the
deputy sheriff.

"When the mortgage was completed, it was read over,
and it was signed and acknowledged by complainant, and,
with the note, duly signed, it was taken by the assistant
prosecuting attorney.    While the mortgage was being
drawn, the complainant was much of the time in tears,
and much disturbed and excited.    At the time the com-
plainant executed the mortgage she was not advised and
did not know fully what Bentley had done, but supposed
he was in great trouble on account of something he had
done, and she executed the mortgage in the belief on her
part that her doing so would save him going to jail.    On
the execution and delivery of the mortgage, the two
officers left the house.    The deputy sheriff turned over
the shortage to the assistant prosecuting attorney, and
the same and the mortgage were given to defendant the

next morning, the 9th of January. On the 9th, Robson, the defendant, and the prosecuting attorney, urged Bentley to turn over the balance of the $1,500, the proceeds of the certificate cashed the day before, and during the day Bentley paid to Robson $500, and in the evening of the 9th he gave Robson $100, which his minor son had let him have from the son's savings. This was done at Robson's urgency that the mortgage be reduced in amount, to enable him to negotiate a sale and transfer of it at Port Huron.

"Before leaving Port Huron, defendant made a criminal complaint against Bentley, by direction of the prosecuting attorney, for forgery, based on the Ballentine matter. Bentley was arrested, and examination before the justice was continued to the 26th of January, 1897, he being let to bail. Before that day arrived, Bentley's fraud in the McPherson matter came to light and to the knowledge of the defendant, who communicated the facts to the prosecuting attorney, who caused Bentley to be arrested and put in jail, where he was on the arrival of the defendant in Port Huron on the 25th of January. Thereupon two new complaints were made by defendant against Bentley, charging him with uttering forged paper, based on each the McPherson and Ballentine matter. Bentley waived examination, and on the 27th of January pleaded guilty to an information in each case in the circuit court, and on one conviction was sentenced to Ionia for seven years.

"It is evident that Bentley was practically in custody from about noon of the 8th of January until complainant, in the evening, executed the mortgage in question, and in actual custody from supper time until the mortgage was executed. The show of force used in the compulsion of Bentley to go to the hotel by officers known to be such, in the condition he was, very naturally impressed complainant with the conviction that he was arrested and about to be prosecuted for a crime, and a serious one; and when he returned, still in the custody of the officer, and she was told by him that it was necessary for her to sign the mortgage to save him going to jail, she must be deemed just as much under duress as though a direct threat of prosecution had been made. When the defendant and the prosecuting attorney sent Bentley, with the officer, to get the mortgage, it is not claimed that they charged him with the duty of informing complainant, when asking her to sign the mortgage, that it was to secure the repayment of

money Bentley had wrongfully taken, or that it was not to secure his release from the custody of the officer, or to prevent a prosecution, but knowing, at least, that he had been brought to the hotel when sick, by officers, from the presence of his family, at night, they did leave him to use such means of securing the signature of his wife as he might feel best calculated to insure success, and they ought to be held responsible for the means he did use; but, whether that is so or not, the conclusion is irresistible that she gave the mortgage for the purpose of securing his release from apparent arrest, and with the belief that it would avoid the imprisonment of her husband. It is her belief that controlled her action in the premises. It was justified by what occurred and what was said to her. She was perfectly innocent of any wrong. There was no consideration for the mortgage. I cannot see that she was indebted to the defendant, or the society he represented, equitably or otherwise, or that they ought to have any lien on her property. It is not necessary that threats of prosecution by words be shown, or that promises to forbear prosecution be actually made, to constitute such duress as will avoid such an obligation. It exists when there is actual violence or restraint contrary to law that compels one to enter into a contract. Complainant was the wife of the party under restraint by the officers of the law, and, in executing the mortgage, acted upon the assurance that she must do so to prevent his going to jail. She was a woman in distress, laboring under excitement. She had a right to imply from the assurance that it was understood that, if she did execute the mortgage, her husband would not be sent to jail. Evidently her will was overcome, and, in my opinion, the prayer of the bill should be granted, with costs."

The record shows that the learned circuit judge was justified in most of his findings of fact. It is impossible to read the record without coming to the conclusion that Mrs. Bentley understood when she gave the mortgage that her husband was in the custody of the officers, and that, to save him from being conveyed to jail, it was necessary for her to give the mortgage which she executed. It was this motive which actuated her to make it. There is nothing in the record to indicate it would have been made had she not believed it would have this effect. The case comes clearly within the principles established by the

following decisions: *Seiber* v. *Price*, 26 Mich. 518; *Vyne* v. *Glenn*, 41 Mich. 112; *Bowe* v. *Bowe*, 42 Mich. 195; *Meech* v. *Lee*, 82 Mich. 274; *Cribbs* v. *Sowle*, 87 Mich. 340 (24 Am. St. Rep. 166); *Miller* v. *Lumber Co.*, 98 Mich. 163 (39 Am. St. Rep. 524); *Benedict* v. *Roome*, 106 Mich. 378. The court was right in holding the mortgage was tainted with duress.

It is now said, even conceding the mortgage was obtained by duress, it was ratified after the duress had passed, by making payments upon it, and by attempting to have it discounted. The conclusion we reach from the record is that the wife and family did all that was done in the expectation and belief that it was necessary to be done to save Mr. Bentley from being imprisoned as the result of his criminal act. What was done after the mortgage was given was in the same line as the giving of the mortgage, prompted by the same motive, expecting to bring about the same result.

It is urged that at least a part of the property covered by the mortgage was paid for by money Mr. Bentley secured, belonging to the defendant, and for that reason should be subjected to the lien of the mortgage. The record shows the lot upon which the house was built was purchased upon a land contract 20 years before Mr. Bentley's crime was committed, and in 1890 the property was deeded to Mrs. Bentley. In 1895 a deed of a strip of land 28 feet wide was made to Mrs. Bentley. This had been purchased earlier upon a land contract, and it is the claim of the complainant it was paid for by money coming from honest sources, and not from the company represented by the defendant. Mrs. Bentley owed the defendant nothing. The mortgage was given upon her property. If she saw fit, she could secure a debt of her husband by a mortgage upon her real estate, but she was under no obligations to do so. When it is made to appear that the mortgage which was executed was given under duress, before a lien can be established upon a portion of the real estate, upon the claim it was the defend-

ant's money which bought the real estate, that fact ought to be made to appear affirmatively.    We do not think this has been done.

The decree is affirmed, with costs.

The other Justices concurred.