## Scott, et al. v. O'Hara.

(Decided October 25, 1912.)

Appeal from Kenton Circuit Court
(Common Law and Equity Division).

1. Obstruction of Justice—Money Paid to Obstruct—Cannot Be Recovered.—Money paid out to obstruct the administration of justice cannot be recovered although it is paid out under threat of prosecution.

2. Same—Agreement to Stifle Prosecution—Money Paid Under Agreement to Cannot Be Recovered.—Where, to carry out an agreement to stifle certain public prosecutions, the parties had proceedings instituted in a police court and judgment entered there, money paid under the judgment can no more be recovered than if it had been paid without these proceedings being held.

O. S. HOGAN, CLORE, DICKERSON & CLAYTON and MYERS & HOWARD for appellant.

JOHN B. O'NEAL, A. G. DeJARNETTE and M. D. GRAY for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE HOBSON—Reversing on original and affirming on cross appeal.

Plaintiffs, James A. and Charles E. O'Hara, brought this action on May 26, 1908, against defendants, J. T. Scott, Kate Martin, D. M. Hall, J. W. Lancaster, J. W. Webb, E. K. Wilson, Robert Childers, J. W. Shields, S M. Billiter, Henry McMillan, D. S. Clay, Wm. Stroud J. Glascock, G. S. Webb, R. T. Dickerson, F. T. Cunningham and M. S. Clark, to recover the sum of $5,-495.95. The petition charges that defendants conspired together for the purpose of obtaining, and extorted said sum from plaintiffs by threatening plaintiffs with criminal prosecution, by intimidating them by

threats that they would ruin them in purse and in character. That said sum was paid by plaintiffs on July 23, 1907, by reason of said threats and intimidation, and while plaintiffs were under duress, and without any legal consideration therefor. In obedience to a rule to make the alleged prosecution more certain and definite, plaintiffs filed an amended petition, specifying that the alleged prosecution would be on the charges of subornation of purjury, conducting a gambling house, operating felonious games, and having in their possession for the purpose of sale intoxicating liquors in local option territory. Defendants' demurrers to the petition were overruled. They then answered in two paragraphs. The first contained a traverse. In the second paragraph they alleged that plaintiffs had within a year sold liquors to divers persons in Williamstown, where local option was in force; that plaintiffs were arrested under warrants from the police court, and pleaded thereto. A trial was had, which resulted in the rendition of many judgments on pleas of guilty. That said judgments were entered in due form, assessing fines against the plaintiffs. That the aggregate amount of fines and costs was $4,995.95, which was paid to the police judge in satisfaction of the costs and fines, and that this was the same money which plaintiffs alleged had been paid to defendants. To this answer plaintiffs filed a reply, admitting the appearance and trial in the police court, the rendition of the judgments, but stating that the fines and costs aggregated only $4,995.95, while they had paid to defendants $5,495.95, leaving $500 in excess of the fines and costs, which was paid to E. K. Wilson, and by him turned over to the defendants. The reply also sets out the circumstances under which the judgments in the police court were rendered, and attacks the validity of the judgments on the ground that they were entered fraudulently and in pursuance of the unlawful conspiracy into which defendants had entered. To this portion of the reply the court sustained a demurrer, thus leaving for the determination of the jury the question of defendants' liability for the remaining $500, which was paid to E. K. Wilson. A trial before a jury on May 1, 1911, resulted in a verdict and a judgment against the defendants, J. T. Scott, D. M. Hall, J. W. Webb, E. K. Wilson, Robert Wilson, J. W. Shields, S. M. Billiter, Henry McMillan and J. Glascock, for the sum of $500,

with interest from July 24, 1907. Under a peremptory instruction from the court, the jury found for the defendants, Kate Martin, J. W. Lancaster, Wm. Stroud, R. T. Dickerson and F. A. Cunningham. From the judgment so entered, defendants Scott and others appealed, and from that part of the judgment denying plaintiffs any relief in excess of $500, plaintiffs prosecute a cross-appeal.

Appellees, James A. and Charles E. O'Hara, are the owners of a drug store in Williamstown, Grant County, Kentucky. The local option law is in force in that county. Appellant Scott and others are members of the Law and Order League, which was organized by them and other citizens of Grant County, for the purpose of suppressing the illegal sale of intoxicating liquors therein, and other crimes. Some weeks prior to the events hereinafter detailed, the grand jury of Grant County returned a number of indictments against James A. and C. E. O'Hara, for the offense of selling intoxicating liquors in that county. These indictments, though subsequently dismissed, were pending at the time of the settlement made by the O'Haras with the Law and Order League.

According to the evidence for appellees, in the month of July, 1907, E. K. Wilson, an attorney acting for the Law and Order League, procured the services of one Ben Lanter for the purpose of obtaining evidence against the O'Haras for the illegal sale of whiskey. Lanter was furnished with the sum of $100, which was borrowed by Wilson from one of the members of the Law and Order League. Lanter went before the police judge of Williamstown, and gave evidence upon which sixteen warrants were afterwards issued against James A. and E. C. O'Hara, and C. O. Porter, the latter being a clerk in their employ. At this time there was already a warrant pending in the police court against C. O. Porter, charging him with the illegal sale of whiskey to one John Donahue. There had been a previous trial of this case, in which the jury failed to agree on the verdict. The second trial was set for July 23. Wilson, acting for the League, had an article published in one of the newspapers, signed, "Law and Order League," denouncing the O'Haras. A copy of this paper was sent to about five hundred people. Included in this list were all the persons who had been selected to serve as grand jurors, and many of the persons who had been selected to serve

as petit jurors, at the ensuing term of the Grant Circuit Court. The League employed Wm. Stroud, the marshal of the town, and his deputy, F. C. Cunningham, whose duty it was to summon witnesses and select jurors in the trial of cases in the police court. At the time, several members of the Law and Order League had subscribed certain sums for the purpose of carrying on the prosecutions. Some of them thought that they should not be required to bear the expense, but that the parties proceeded against should pay something into the treasury of the League. At first it was suggested to the O'Haras that they make a donation to the League of a sum of money ranging from $500 to $1,200, in addition to paying fines upon the sixteen warrants that were held over them but had not been issued. It was represented to the O'Haras that the Law and Order League had full control over the court, and any prosecutions conducted by them would certainly result in a conviction. They stated to the O'Haras that unless they made some sort of a settlement with the League, they would have the O'Haras arrested and prosecuted upon charges other than the mere selling of whiskey. They stated to the O'Haras that if necessary they would be subjected to a prosecution on the charge of inducing John Donahue to commit perjury, and upon a charge of operating felonious games, which, in case of conviction, would result in a term in the penitentiary. They also stated that they were able to procure a witness who would swear out fifty or more warrants against the O'Haras for as many separate offenses of having liquors in their possession for the purpose of sale in local option territory, which, in case of conviction, would involve jail sentences. A few days before the payment of the $5,495.95 sued for, a meeting was held in the directors' room of the Grant County Deposit Bank. This meeting was attended by the O'Haras, and appellants S. M. Billiter, E. K. Wilson and D. M. Hall. At this meeting a committee representing the League, demanding of the O'Haras that they pay into the treasury of the League the sum of $5,000, and that they also settle the sixteen warrants which had then been issued, by paying fines into police court in the sum of $1,000. The demand was accompanied by a threat that a failure to comply therewith would be followed by prosecutions for felony. It is claimed that it was made known to the O'Haras that the League had in

its employ an irresponsible person who was ready and willing to swear out such felony warrants as the league demanded. The minutes of the League show that just preceding the settlement which it made with the O'Haras, J. W. Webb was re-elected treasurer of the League, and a new committee, consisting of D. M. Hall, S. M. Billiter, J. W. Webb, Henry McMillan and E. K. Wilson, was appointed to settle with the O'Haras. Up to this time it is claimed the League was demanding the payment of $5,000 into its treasury, in addition to the $1,000 to be paid into court. On the following Tuesday morning the O'Haras were informed that the members of the League had been advised that if they took the money in the manner proposed, they would render themselves liable in a suit to recover it as blackmail. Upon the advice of their attorney, they concluded that it would be best to settle the matter through the courts, by judgments regularly entered, but with the understanding that as much as possible of it should go into the treasury of the League. It was proposed that a contract should be made with the town trustees by which E. K. Wilson and C. H. Beasley should receive the sum of $500 each for their services, with the understanding that Beasley should keep his $500, and that Wilson should turn his $500 over to the League. It was further decided that an agreement should be reached with the city attorney by which he would turn over to the League all the money received by him as his pro rata of the fees in excess of $1,000. Finally it was decided that, in addition to the $5,000 paid through the medium of the court, the O'Haras should pay to E. K. Wilson the additional sum of $500, which he should turn over to the League. It is claimed that appellants required C. E. O'Hara, who was chairman of the board of trustees of the town, to go to his fellow members and do what he could to obtain their consent to the allowance of $500 each to Beasley and Wilson, the attorneys for the League. To induce the city attorney to consent to the arrangement, it was represented that unless such an agreement was made, the prosecutions would be taken out of his hands entirely, and he would receive nothing in the way of fines. The contract with the board of trustees, and the agreement with White, they demanded should be reduced to writing and signed by all the parties and placed in their hands as a guarantee that they would receive the money

they were after before the final steps were taken to consummate their purpose, by the entering of the judgments in the police court. Late in the afternoon the committee met, and the contract with the board of trustees, and the agreement with the city attorney and the League's attorney were turned over to them. By an arrangement with the judge of the police court, it was agreed that a sufficient number of warrants for selling whiskey should be written out, and a record made in the police court of judgments, of guilty and not guilty, that would aggregate the sum of $5,000 in fines and costs. Then, by the instructions of the committee, one of its members, E. K. Wilson, drafted a paper settling the whole matter, which the O'Haras, together with their clerk, signed. That night the warrants were prepared, and C. E. O'Hara assisted in their preparation. The next day the O'Haras paid to the police court judge the sum of $4,995.95, and to E. K. Wilson the sum of $500. At the time of the payment of the money to the police court judge, there had been no judgments entered upon the record of the police court. During the next few days he checked up the amounts of the separate fines and costs in each case, according to the memorandum furnished by E. K. Wilson, and made up his record at leisure. That record shows that in some cases there were pleas of guilty, and in others a submission of the law and facts, in which the court determined by the judgment that some of the persons mentioned in each warrant were guilty and others were not guilty. The town board paid to Beasley the sum of $500, which he was allowed to keep as his fee. A similar warrant for the same amount was drawn in favor of E. K. Wilson. Three or four days later, the League received from the city attorney the sum of $1,346.50, which was its part of the fees in excess of $1,000. Wilson paid to the treasurer of the League the $500 that was paid him by the O'Haras. Thus it will be seen that the League received in actual cash the sum of $1,846.50. On August 5, 1907, the minutes of the Law and Order League of Williamstown, Ky., show the following:

"The report of the executive committee in regard to the settlement of J. A. and C. E. O'Hara, C. O. Porter and B. S. Franks, was read, filed and approved by the League."

That report is as follows:

"To the Law and Order League: Your committee having the direct supervision of the prosecutions for violations of law, especially with reference to the illegal sale of spirituous, vinous and malt liquors, in the town of Williamstown, Ky., beg to report that the object desired has been attained to a most notable degree, and while the result may not have been according to the views of each member of this committee and League, we think, on the whole, it was most satisfactory. There had been criticism of the low amount of fines against B. S. Franks, but it was considered that at the time of his apprehension, he had quit his illegal business, and the further fact that he had not, as others involved in the prosecution, promised to desist from the same and failed to do so. Mr. Franks was fined $400, and paid our attorneys $250, $125 of which was turned over to the League by them. The O'Haras paid into police court $4,955.95 in fines and costs, and $500 to our attorney. By an arrangement with the city attorney of Williamstown, Ky., by our attorney, they received from his $1,347, and the trustees of the town allowed them attorney's fees of $1,000, $500 of which was turned over to the League, who paid out in attorneys and other fees, the sum of $477, leaving in the treasury of the League $1,497. We make as a part of this report the contract with the parties at the time."

The foregoing report was signed by E. K. Wilson, James W. Webb, Henry McMillan and D. M. Hall. About this time the $100 borrowed from the member of the League to pay Lanter was returned, and $200 was paid the marshal, Wm. Stroud, and $200 to his assistant. Appellees testify that they made the settlement because of the constant threats and representations of the appellants that they had the court officers in their employ who would select the juries, and that they could easily find men who would swear out warrants against them for felonies, and support them by the necessary evidence; that because of these threats, and the consequent fear that they would be subjected to numerous criminal prosecutions involving not only heavy fines and jail sentences, but sentences in the penitentiary, and the belief superinduced by the representations of appellants that appellants were in control of the court and its officers, and that they would not be able to secure a

fair trial, they were perfectly helpless and submitted themselves to the mercy of appellants.

During the progress of the trial it developed that those defendants in whose favor the court directed a verdict were not concerned in any way in the settlement made with the O'Haras, or strenuously objected thereto, and for that reason the court held that they were not liable. The testimony for the defendants below is to the effect that the settlement was the result of insistence on the part of the O'Haras, who for more than two weeks besought the members of the League to compromise the pending prosecutions by permitting them to plead guilty to a sufficient number of warrants to make up the sum of $5,000. The members of the League claimed that several of them were really friendly towards the O'Haras, and that they insisted on a compromise at a much less sum than was finally agreed on. They state that they were constantly urged and begged to take the course that was subsequently taken. They claim that no representations were made to the O'Haras that they would be prosecuted upon any other charges than those of the illegal sale of whiskey; that the O'Haras were anxious for a settlement all the time, and the only question involved was the amount of the settlement. Appellants further testify that they were engaged in an attempt to clean up the town and stop the illegal sale of whiskey. For this purpose they employed lawyers who were regular practitioners at the bar, and committed to them the prosecutions, not only against the O'Haras, but all other violators of the law. Appellants further state that C. E. O'Hara himself suggested that he would see the members of the town board, and did see them, for the purpose of getting their consent to the payment of the attorneys' fees to Wilson and Beasley. The evidence further shows that C. E. O'Hara was present when the numerous warrants were drawn up, and assisted in their preparation. It is also shown that some of the witnesses on these warrants were witnesses who had appeared before the grand jury, and that his purpose in having them as witnesses was to prevent any other prosecutions based on their testimony. Some of the defendants claim that they had no knowledge of the fact that any portion of the money paid by the O'Haras came into the treasury of the League.

It would serve no good purpose to detail the evidence more at length.  We conclude that upon the question of conspiracy, and of the participation of the appellants therein, there was sufficient evidence to justify the submission of the case to the jury.  The evidence leaves no doubt that the sum of $1,846 was turned into the treasury of the League.  Those who claim to know nothing about the settlement also claim that they had no knowledge of the fact that such a sum was turned over to the League, and yet the minutes of the League show this conclusively.  The question to be determined is; should the court, on these facts, lend its aid to appellees to recover the money which they paid under the illegal arrangement?  All the parties understood, fully, what they were doing.  They entered into a deliberate attempt to stifle certain public prosecutions, in which appellees might have been both fined and imprisoned and after the prosecutions have been stifled and it is too late for them to be renewed on account of limitation, appellees seek to recover the money which they paid out to stifle the prosecutions.  In Swan v. Chandler, 8 B. Monroe, 97, this court said:

"Any contract to impede the due course of public justice is illegal.  It is against public policy to permit individuals to settle and adjust offenses of a criminal nature, the punishment of which is deemed essential to the general welfare.  The effect of such contracts is to encourage the commission of crime and the law denounces them as impolitic and illegal."

In Gardner v. Maxey, 9 Ben Monroe, 90, the court said:

"The Commonwealth, it is true, does not desire the prosecution, and much less the conviction of the innocent, but would prefer rather that even the guilty should escape.  But it is the interest of the Commonwealth, and the policy and intention of the law, and is essential to public order and individual security, that the laws against offenses injurious to the public, should be fairly administered and enforced.  And to this end it is essential that the course of public justice should not be obstructed by private combinations or agreements for preventing the fair investigation of alleged offenses.  The Commonwealth has a right to rely upon the individual who has received special injury from the commission of a public offense, as the special instrument for its

ascertainment and punishment in the due course of law. The particular interest which he may be supposed to feel in bringing the offender to justice, is one of the securities on which the public relies, and has a right to rely for the enforcement of the laws and its own safety; and an agreement by which this interest is turned against the Commonwealth, is in violation of her rights and policy."

To the same effect see note to Town of Hinesburgh v. Sumner, 31 Amer. Dec., 600; 15 Amer. & Eng. Cyc. of Law, 979; Bishop on Contracts, section 493, and cases cited.

In Kimbrough v. Lane, 11 Bush, 556, Kimbrough had a claim against Lane for several thousand dollars. Kimbrough was foreman of the grand jury and induced the grand jury to find an indictment against Lane. He then agreed with Lane that if Lane would pay, or sesure, him three thousand dollars he would procure a dismissal of the indictment. Lane executed a note and mortgage to Kimbrough, which was sought to be enforced. These facts being shown, the court refused any relief. The court said:

"It is urged by some of the appellant's counsel that as Lee purchased the land mortgaged by Owings subject to the mortgage, and he will be so much the gainer if the appellant fails in his efforts to foreclose, while Owings and Lane will gain nothing, this ought to have some weight with the court in deciding the question.

"It is sufficient to say on this point that the rule of law inhibiting such contracts was not made for the benefit of the obligors therein. They stand in no better position in the eyes of the law than the obligees. The courts will not enforce such contracts, because they are leveled at the safety and repose of society, and are calculated to shield the guilty from punishment and leave them free to prey upon the public. If money is paid upon such a contract, the courts will not aid in recovering it back; they will leave both parties in the exact position in which they have placed themselves."

The rule that money paid upon an illegal contract cannot be recovered in a court of justice has been followed by the court in many cases. Jennings v. Flanagan, 5 Dana, 217; Ratcliff v. Smith, 13 Bush, 173; C. & O. Ry. Co. v. Maysville Brick Company, 132 Ky., 643, and

cases cited. In Feltner v. Feltner, 132 Ky., 705, money was placed in the defendant's hands to be held until a witness left the State and did not appear on the trial on the case and the money was then to be paid over to the witness. It was held that the witness could not maintain an action against the defendant for the money as the court would not lend its aid to any of the parties to such an agreement. In The American National Bank v. Madison, the facts were these:

Josephine Madison had executed her notes to Claypool & Company, who had discounted them to the American National Bank. The bank brought suit against her on the notes. By way of defense she pleaded that she was coerced into their execution by Claypool with a threat that he would prosecute her son for embezzlement if she did not do so and that the notes were executed under duress and under the agreement of Claypool not to prosecute her son for embezzlement if the notes were given. The bank pleaded that it was the holder of the notes in due course and without notice. Mrs. Madison then set up that Claypool had sold the notes to the bank and received the proceeds; she sought judgment against him to this extent for what she might have to pay the bank. The circuit court adjudged her this relief. Reversing the judgment, this court said:

"It was clearly an illegal contract, one which the law would not enforce, nor against which will it afford relief. If appellee, instead of executing her notes and mortgage had paid to Claypool the $2,500 in cash, and then thereafter sought to recover of him this money on the ground that it was paid for the purpose indicated, the law would have afforded her no relief. She is in no better position as to the notes by reason of the unlawful, vicious and void contract into which she entered. The law will not lend its aid to the enforcement of such a contract, but simply leaves the parties where it finds them." (144 Ky., 158.)

We are unable to see that this case can be distinguished from those cited. It is insisted that the appellees were under duress and that relief may be granted on that ground, but if such a principle were applied on the facts of this case the rule that the courts leave the parties to illegal transactions where it finds them would amount to nothing. The appellees and appellants were

all men of intelligence. There was no relation of trust or confidence between them. The facts were fully understood by them all and the arrangement was made with much deliberation and evidently after careful consultation. One side was as able to take care of itself as the other, and if the mere fact that a prosecution or prosecutions were threatened, would take such a case out of the rule, the rule would be valueless. In Kimbrough v. Lane, the prosecution had actually been set on foot for the purpose of extorting the money. In The American National Bank v. Madison the defendants were threatening to begin the prosecution and in that case the person threatened was the mother who executed the papers to protect her son. In a number of cases which have been relied on the court simply refuses to give its aid to the enforcement of the illegal contract. In others there were peculiar facts and circumstances not applicable here which were deemed by the court sufficient to take the case out of the general rule, but as was well said, in Porter v. Jones, 6 Cold., 313, the principle that a court will grant relief to a party to an illegal contract where he acted under oppression and was compelled by hardship or necessity has often been pushed further than justice or the facts will warrant. In 5 Lawson on Rights and Remedies, section 2364, the common law rule as to duress is thus stated:

"Duress may consist either in actual imprisonment of the person, or in threats to imprison or do violence. It consists, not merely in the act of imprisonment or other hardship to which the party was subjected, but in the state of mind produced by those circumstances, and in which the act sought to be avoided was done. The imprisonment must be illegal. A legal imprisonment is not duress. But the process may be regular; yet if the arrest and imprisonment is malicious, and without probable cause, there is duress which will void a contract. Where the only coercion influencing the person's mind is the fear of the consequences of his own criminal act, this is not legal duress."

This court has steadily declined to extend the common law rule; Edwards v. Handley, Hardin, 611; Hazelrigg v. Donaldson, 2 Met., 445. In Anderson v. Meredith, 82 Ky., 564, a strong man had imposed upon a weak one under a relation of confidence and so procured from

him his property to prevent its being reached by his creditors and it was simply held that they were not *in pari delicto.*

It is essential to the peace of society that the laws be executed. All agreements having for their purpose the suppression of public justice are not only illegal but must be known to be illegal by all persons of ordinary intelligence. To say that a man of ordinary intelligence may have the aid of a court of law to recover back what he has paid under such an agreement simply because he was threatened with prosecution would be to destroy the rule for such agreements are rarely ever made in the absence of such threats either by word of mouth or by conduct. The appellants have put themselves in a very bad attitude. They have no right to the money which they have received. Their conduct deserves condemnation but the rule of law is not for their benefit. The purpose of the rule is to prevent such agreements being made. To hold that money may be recovered back upon the ground of duress, upon such proof as we have here, would be to lay down a rule that would tend to promote the making of such agreements; for, the defendant could then, in this way, get rid of the prosecution, and after he was safe from that, have a chance to get his money back. Sound public policy requires that the rule should be strictly enforced; that the court will not lend its aid to either of the parties in such illegal contracts, but will leave them where it finds them.

The fact that the process of the police court was resorted to adds nothing to the rights of the appellees. Both sides entered into this plan to accomplish their purpose, desiring the shield of the police court proceedings. If the police judge would not give a fair trial, the defendants could have had a change of venue under section 1107, Ky. Stat., and if he declined to vacate the bench, he could have been required to do so by a writ from this court. Rush v. Denhart, 138 Ky., 238. If the marshal could not properly summons the jury, another officer might have been designated for the purpose. Criminal Code of Practice, section 193. Appellees could have appealed from the judgment of the police court to the circuit court, and from it to this court, and thus corrected any injustice which might be done them there. To shut off a public trial, they went into that court, assisted in preparing the warrants, and procured the proceedings

which were there had. They paid to Wilson the $500.00 under the agreement with appellants by which these judgments were procured. The whole arrangement was a manifest attempt to obstruct public justice.

There is no charge that the police judge or the marshal were parties to any conspiracy, and no evidence to warrant such a conclusion. If appellees could not have recovered the $1,846.50 paid by them, if the payment had been made directly to appellants and not through the police court proceedings, certainly they have no greater rights when they themselves went into that court and procured the proceedings which were there had. The fact that the parties veiled their transaction in the form of a legal proceeding subtracts nothing from its illegal purpose, and appellees are in no better position now than they would be if they had paid the $1,846.50 to appellants, and those proceedings were never had. So, the question in the end comes to this: What would be the rights of appellees if they had paid the $1,846.50 directly to appellants without any proceeding in the police court?

But if it were shown that the police judge and the marshal were in the scheme, the result would not be different. He who corrupts the officers of justice cannot have the aid of a court of justice to recover money paid out to obstruct justice. The officer may be punished for misfeasance in office, but the shortcomings of its officers is no reason for the court's relaxing the rule against attempts to stifle justice. The law afforded appellees ample remedy to secure fair officers, if justice had been what they wanted. When they paid out the $1,846.50 rather than take the remedies the law provided, it cannot be said in any sense of the word that they labored under duress.

They who unlawfully conspire to extort money from another or enter into any other unlawful conspiracy may be indicted and punished. And it is more fitting that this remedy be pursued than that they who obstruct public justice should be aided by the courts in the recovery of what they pay out for this end. We, therefore, conclude that the court should have instructed the jury peremptorily to find for the defendant.

Judgment reversed and cause remanded for further proceedings consistent herewith.

On cross-appeal, the judgment is affirmed.

DISSENTING OPINION BY JUDGE CARROLL.

The opinion of a majority of the court in this case holds in effect that judges of courts and other court officers may surrender the jurisdiction and powers of their offices and the enforcement of the law to private individuals, to be used for the purpose of extorting money for their private benefit, and that money so exacted cannot be recovered by the persons who were forced by threat and duress to pay it.

To this proposition, which I have not stated too broadly, I cannot give my consent. The facts recited in the opinion show beyond doubt that the appellants entered into an arrangement with the judge of the police court, the prosecuting attorney, and the marshal of the city, by which the control and disposition of prosecutions against appellees were turned over to appellants, to enable them to extort money from appellees to reimburse themselves for money they had paid out in an effort to prevent appellees from violating the law, and that in pursuance of this arrangement, they collected from appellees $1,846.50, a large part of which appellants put in their pockets, and the remainder they paid in fees to others who advised and assisted them in securing the money.

I have no sympathy with the appellees. They were persistent and flagrant violaters of the law and richly deserved any punishment that might have been imposed upon them in the course of justice duly administered. But the circumstance of their guilt ought not to influence this court to lay down a doctrine that sanctions the abdication by officers of the law of the powers conferred on them in discharging their official and ministerial duties and approves the surrender of this great authority to private individuals for their own gain. The appellants had no claim or demand of any kind or character against appellees. The appellees did not owe them one cent, nor did they have the right to collect or receive one penny of the money that appellees might have been required to pay as a punishment for their violations of the law; but notwithstanding this admitted fact the record shows that, with the connivance and assistance of the judge of the court, the prosecuting attorney, and the marshal of the city, they were permitted to receive and

retain for their own use the sum of money before mentioned, and this court holds that they may keep it.

I do not question the right of appellants to prosecute appellees, or their right to employ counsel, or their right to use every legitimate influence to secure their conviction, but I insist that when they entered into an agreement with the court and court officials, and these officers surrendered to them all the power and jurisdiction of the court, to enable them to extort money for their private gain, they should not be allowed to hold the money so obtained. But under the rule laid down in the opinion this course of conduct is sanctioned, and judges of courts and officers are authorized and permitted to enter into agreements with private individuals by and through which they may use the machinery of the courts to prosecute persons who have incurred their displeasure, and to reap personal profit from sham proceedings instituted under the forms of law. I do not believe that any case can be found giving the slightest support to this doctrine, and I am sure that no one of the cases cited in the opinion sustains it.

In American National Bank v. Madison, 144 Ky., 152, Fonza Madison was guilty of embezzling funds from Claypool & Co. To prevent his prosecution for this offense, his father and mother executed a note, secured by a mortgage, to Claypool & Co., for the amount embezzled, which note Claypool & Co., collected. The Madisons sought to recover from Claypool & Co. the amount paid on the note, but we held that as the note was executed to compound a felony the court would not aid either of the parties to the prosecution, saying: "It was clearly an illegal contract, one which the law would not enforce, nor against which will it afford relief. If appellee, instead of executing her notes and mortgages, had paid to Claypool the $2,500 in cash, and then thereafter sought to recover of him this money on the ground that it was paid for the purpose indicated, the law would have afforded her no relief."

In Feltner v. Feltner, 132 Ky., 705, Feltner sought to recover from a stakeholder a sum of money that it was agreed should be paid him in consideration of his leaving the State and refusing to appear as a witness in a pending law suit, and we held that as the transaction was an effort to obstruct justice the courts would not aid Feltner to recover the money.

In Kimbrough v. Lane, 11 Bush, 556, Kimbrough procured an indictment against Lane for obtaining money from him under false pretenses, and afterwards agreed with Lane that he would procure the dismissal of the prosecution if Lane would execute to him, with security, a note for the amount due. In a suit by Kimbrough against Lane on this note we held that he could not recover, as the note was executed to suppress a public prosecution.

In Gardner v. Maxey, 9 B. M., 90, Gardner executed his note to Sturgeon, to induce Sturgeon not to prosecute him on a charge of having maliciously wounded Sturgeon. In a suit on the note we held that as it was executed to compound a felony there could be no recovery.

In Swann v. Chandler and Phillips, 8 B. M., 97, Swann executed his note to Lanham in consideration of Lanham's agreement not to prosecute him for an assault committed by him on Lanham. In a suit on the note we held that there could be no recovery, as the note was executed to impede the course of public justice.

I entirely agree with the reasoning of these opinions and in the conclusion reached by the court in each of these cases, and if the appellees had paid to appellants, independent of the court and its officers, the money in question, for the purpose of inducing appellants not to prosecute them, or for the purpose of inducing appellants to assist them in any manner in compounding their offenses, or thwarting the course of justice, I would at once say they could not recover. In cases like this the court should keep its hands off and leave the parties exactly where they placed themselves.

But the radical and material difference in the cases cited and the case now before us consists in the fact that in this case the appellants were enabled to extort money from appellees by collusion with the court and court officials having jurisdiction to prosecute appellees for the offenses they were guilty of, while in the cited cases there in no intimation of judicial interference. That these court officials were actively aiding appellants in their efforts to get the money from appellees is established by the fact that the judgments against appellees were not entered of record until some days after the money in satisfaction of these judgments had been paid and appellants had gotten their share of it, and by the further fact that the city marshal and his deputy were

each paid $200, as their share of the spoils. How much the police judge received for his valuable services is not shown.

It is said, however, in the opinion, that as appellees were parties to the sham court proceedings and consented to all that took place, they aided in compounding the offenses they were guilty of, as well as in obstructing public justice, and so should not be afforded any relief. The fundamental error in this statement consists in the fact that appellees did not consent to the settlement or to what occurred in court. They were forced, by threats of prosecution for other offenses and by divers other methods of duress, to acquiesce in what was done and to make the best accommodation possible under the circumstances. Their adversaries had control of the court and all of its officers. They had all the instrumentalities of the law at their complete disposal. They had it in their power to impose as many fines and imprisonments as they pleased, and I am at a loss to understand how it can be said, under these conditions, that appellees consented to the payment of the money to appellants to obstruct justice.

I venture the opinion that no case can be found in the books that presents as strong reasons as this one for saying that the money was obtained by threat and duress, and that no case can be found supporting the opinion in holding that, under the facts shown by this record, the appellees should be denied a recovery, on the ground that they assisted in a scheme to obstruct justice. Of course they could have declined to pay anything and have taken the consequences of their refusal, but they ought not, under the facts of this record, be denied relief for failing to pursue this course or for making the best possible settlement under the circumstances confronting them.

Suppose a body of men, desiring to suppress the unlawful sale of liquor or some other illegal conduct in their county, should enter into an arrangement with the Circuit Judge and Commonwealth's Attorney of the district and the sheriff of the county, to turn over to them the control and disposition of contemplated prosecutions, and after they had done this, had notified the persons they were prosecuting that the judge of the court the Commonwealth's Attorney, and the sheriff, would prosecute and convict them for various offenses,

if they did not pay over to their prosecutors a stipulated sum of money, and that acting under the influence of these threats and the powerful agents back of them, they paid the agreed amount, would any court be found to say that the money so obtained could not be recovered because the parties paying it consented thereto and were not under duress? I think not.

But the case I have supposed is no stronger than the one we are dealing with, and I reiterate that, when the court having jurisdiction to punish, and the court official having authority to prosecute and to summon witnesses and impanel jurors, enter into an arrangement with private individuals under which money is paid by threats and duress to persons not entitled in law or morals to a cent of it, the money so paid may be recovered, and the parties who have received it will not be allowed to shield themselves behind the plea that the persons making the payment were parties to a scheme to obstruct justice. It is not a sufficient answer to this to say that if appellants are allowed to recover this money they will have succeeded in escaping to that extent the punishment they deserve. It is better that they escape entirely than that money obtained as this was should be retained by persons who secured it through their corrupt bargain with judges and court officials.

I have not thought it necessary to cite any authorities in support of the general views announced, although what I have said finds ample support in the cases of Bryant v. Peck and Whipple Co., 154 Mass., 460; Richardson v. Duncan, 3 N. H., 508; Woodham v. Allen, 130 Cal., 194; Bentley v. Robson, 117 Mich., 691; Bell v. Campbell, 123, Mo., 1; Hartford Fire Insurance Co. v. Kirkpatrick Dunn & Co., 111 Ala., 456; Adams v. Irving National Bank, 116 N. Y., 605; Shultz v. Culbertson, 49 Wis., 122, and the cases cited in the full notes to Colby v. Title Insurance & Trust Co., 35 L. R. A. (n. s.), 813; City National Bank v. Kusworm, 26 L. R. A., 48, and Williamson-Halsell Frazier Co. v. Ackerman, 20 L. R. A. (n. s.), 484.

In my opinion the judgment appealed from should be affirmed and the judgment on the cross-appealed reversed.