Argued January 18, affirmed March 6, modified on rehearing March 27, 1917.

# ROSTAD v. THORSEN.*

(163 Pac. 423; 163 Pac. 987.)

**Bills and Notes—Duress.**

1. Where the principal stockholder of a bank, by means of forgeries and fictitious notes, depleted the bank's funds so that it became insolvent, and officers of the bank went to the stockholder's wife, who, understanding from what they said, though no actual threat was made, that her husband's prosecution would ensue, unless his defalcation was made good through her assistance, executed certain notes to make good the defalcation, such notes were void, or at least voidable at the wife's option.

#### ON REHEARING.

**Husband and Wife—Deeds—Consideration.**

2. Ten thousand dollars advanced by the officers of the bank to assist it to carry on business was not in itself sufficient consideration to uphold the wife's conveyance of property to them; illegal transactions are such, though a portion of the consideration is legal.

**Deeds—Duress.**

3. Where the chief stockholder of a bank stole funds from it and purchased property, and the bank's officers, by threatening her hus-

---

*For a discussion of the question of contracts procured by threats of prosecution of a relative, see notes in 26 L. R. A. 48; 20 L. R. A. (N. S.) 484; 37 L. R. A. (N. S.) 535, L. R. A. 1915D, 1118.

Reporter.

band with prosecution, induced the wife to execute conveyances of the property, the wife was not entitled to cancellation of the conveyances as procured by duress.

[As to recovery of money paid under duress, see note in 94 Am. St. Rep. 419.]

From Multnomah: ROBERT G. MORROW, Judge.

Celia M. Rostad brought suit against M. G. Thorsen and others in which a decree was rendered in favor of the plaintiff and defendants appeal.          AFFIRMED.

Department 2.     Statement by MR. CHIEF JUSTICE McBRIDE.

This is a suit by the plaintiff, who is the wife of Hacon Rostad, to cancel as to her a certain deed to property in the City of Portland, three notes, aggregating $15,270, signed also by her husband and made payable to the defendant Oregon Securities Company, and her power of attorney executed in connection with the deed and notes.     The facts out of which this controversy arose are these: The Multnomah State Bank of Lents is a corporation with a capital stock of $15,000. From its organization in 1910, to December 15, 1914, Hacon Rostad was its cashier and had active management of the bank.     The defendant C. F. Hendricksen was president of the bank and owned 10 shares of stock. The defendant M. G. Thorsen was vice-president and owner of five shares.     The defendant Harkson was the owner of 20 shares.     Rostad was the principal stockholder, and in December, 1914, was the owner of 55 or 60 shares, which stock was hypothecated for practically all its value.     The defendant Hendricksen was then and is now the president of the Scandinavian-American Bank, at Portland, and the defendant Thorsen a large stockholder.     The defendant Oregon Securities Company is a collateral corporation of the

Scandinavian-American Bank with practically the same officers as that bank. By means of forgeries and fictitious notes covering a period of about 3 years, and unknown to the other officers and directors, Hacon Rostad converted to his own use and depleted the assets of the Multnomah State Bank to the amount of about $21,700; and when his forgeries were discovered about December 14, 1914, and he was confronted with the evidence, he made a full confession to the officers of the bank and to Mr. Sargent, superintendent of banks. Such depletion rendered the bank insolvent, and for that reason it became the duty of the superintendent of banks to take charge of its assets and to close its doors unless its officers and directors should provide such funds again to make the bank solvent. Hendricksen, Thorsen, and Harkson had been personal friends of Rostad, having implicit confidence in his integrity. When accused by these gentlemen, he admitted the shortage and expressed the willingness to make restitution, it being agreed on their part that so far as they were concerned as officers of the bank no prosecution would be instituted in case he reimbursed the bank to the amount of his defalcations. He expressed his willingness to do so, but had little property to turn over. He represented to the bank that his wife, the plaintiff herein, would soon become heir to a considerable amount of property then belonging to her mother in North Dakota, and that her notes would be good. The question was raised as to whether Mrs. Rostad could be induced to sign the papers with her husband to help make good the shortage. Mr. Rostad expressed a doubt as to whether he could persuade her, and suggested that Mr. Hendricksen should call at their home in Portland and assist him in inducing her to sign. In pursuance of this request Hendricksen called on her

on the evening of the 16th of December and talked with her, to the result that on the following day she came to the office of the attorney for the defendant and signed a deed to the home occupied by herself and husband in Portland, and in addition signed three notes aggregating $15,270. The notes were signed by her and her husband in duplicate, one set being kept by the defendants and she taking the other set with the understanding that she would go to North Dakota and try to induce her mother to sign them. It was agreed that if she succeeded in doing so, the set of notes so delivered to the defendants would be returned. She did not succeed in getting her mother to sign the notes, and returned to Portland on December 31st. On the 12th of January, 1915, her husband was arrested, subsequently indicted, pleaded guilty, and was sentenced to the penitentiary. Soon after her return from North Dakota the plaintiff consulted counsel for the first time, and demanded the return to her of the notes delivered to defendants, a cancellation of the conveyance to the home, and also of the power of attorney. She then brought this suit alleging, in substance, that she was induced to sign the notes and other papers through duress, coercion, and undue influence exercised upon her by the defendants by threatening that unless she signed the papers and notes her husband would be sent to the penitentiary, and that the notes were executed by her without consideration except upon the express promise and assurance made to her that her husband would not be prosecuted if she would sign them, which promise was not kept. The court found for the plaintiff upon all the issues and decreed that the relief prayed for by her should be granted, from which decree the defendants appeal.	AFFIRMED.

For appellants there was a brief over the names of *Mr. Charles A. Johns* and *Mr. Claude M. Johns,* with an oral argument by *Mr. Charles A. Johns.*

For respondent there was a brief over the name of *Messrs. Clark, Skulason & Clark,* with an oral argument by *Mr. Bardi G. Skulason.*

Opinion by MR. CHIEF JUSTICE MCBRIDE.

1. We think it is established by the preponderance of the evidence that the defendants, at least, impliedly gave Rostad to understand that if he made restitution, he would not be prosecuted; and that there was an implied threat that unless he did make restitution the law would be permitted to take its course. The matter was in such a position that it was evident his only chance of escaping the penitentiary was to make restitution for the amount of his theft. The evidence also indicates that Rostad, previous to the visit of Hendricksen to the plaintiff, informed her of the circumstances and gave her to understand that unless she assisted him he would be sent to the penitentiary. We think the evidence also establishes the fact that when Hendricksen visited her, while he did not in terms threaten that Rostad would be prosecuted unless he made restitution, he used language which conveyed that impression, and that he certainly went so far as to give her to understand so far as the bank or its officers were concerned no prosecution would be instituted in case she joined with Rostad in executing such papers as would make her jointly liable for the amount embezzled by him. In fact, Mr. Hendricksen admits having gone this far. We are satisfied from the testimony that Mrs. Rostad was induced to sign the papers in question solely to prevent her husband from being prosecuted, and that

the defendants understood this, and that she understood that his prosecution would certainly ensue unless the defalcation was made good through her assistance; and that this and no other consideration was the cause of her signing the notes in question.   While no actual threat to put her husband in the penitentiary was made in words, the situation was placed before her in such a light as to make it suggest to her that the only way she could save him from imprisonment and disgrace was by executing the notes.   There was no other consideration for them.   She had not had the benefit of the stolen money so far as the testimony shows, and did not know of her husband's thefts until they were disclosed to her by him and Mr. Hendricksen.   Naturally, in her disturbed condition of mind, by reason of the shock of these revelations and the thought of the disgrace that would be inflicted upon her husband, herself, and her two children, she consented to sign.   We think that this was not her voluntary act.   Whether we call it duress or undue influence matters little.   The fact remains that she signed the papers under the promise from the defendants to do everything in their power to stifle the prosecution, and we think the modern authorities are practically unanimous in holding that an instrument executed under such circumstances is void, or at least voidable at the option of the party executing it.

Considerations of policy and morality dictate that no person shall make a trade of a felony, or if he is aware that a crime has been committed, he shall not convert that crime into a source of profit or benefit to himself.   The defendants knew Rostad was guilty of a felony; they knew he was unable to make restitution; they knew the only way to recoup themselves was to induce his wife to execute the documents in question;

and they undoubtedly knew she was doing so for the purpose of preventing her husband's prosecution. By agreeing that they would not prosecute, which, in effect, was promising that so far as they were concerned they would stifle the prosecution, they obtained an additional advantage to themselves at the expense of a woman unadvised by counsel, distracted by grief and fear for the safety of her husband, and oppressed by a sense of the disgrace ensuing to her and to her children. The case of *Williams* v. *Bayley,* 1 Law Rep. Eng. & Irish App. 200, is exactly in point. In that case a son had forged the name of his father to a large number of notes. When confronted with the proofs of the crime he admitted it, and although no threat was made to prosecute him the father was informed of the forgeries and told of the consequences to his son, and was asked to charge his own property to secure the amount of the forgeries. Concerning this Lord Westbury in his opinion makes the following remarks:

"The bankers admit, most clearly and distinctly, that they all knew that it was a case of transportation for life. It is perfectly clear that they did not pretend that the father was liable. What remained then as a motive for the father? The only motive to induce him to adopt the debt was the hope that by so doing he would relieve his son from the inevitable consequences of his crime. The question, therefore, is whether a father appealed to under such circumstances, to take upon himself an amount of civil liability, with the knowledge that, unless he does so, his son will be exposed to a criminal prosecution, with the certainty of conviction, can be regarded as a free and voluntary agent? I have no hesitation in saying that no man is safe, or ought to be safe, who takes a security for the debt of a felon, from the father of the felon under such circumstances. A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract that should be based upon the free

and voluntary agency of the individual who enters into it. But it is clear that the power of considering whether he ought to do it or not, whether it is prudent to do it or not, is altogether taken away from a father who is brought into the situation of either refusing, and leaving his son in that perilous condition, or of taking on himself the amount of a civil obligation. I have, therefore, in that view of the case, no difficulty in saying that, as far as my opinion is concerned, the security given for the debt of the son by the father under such circumstances was not the security of a man who acted with that freedom of power of deliberation that must, undoubtedly, be considered as necessary to validate a transaction of such description."

With how much greater force does this language apply to the plaintiff in the present case. In the case cited the party who was induced to sign the instrument was a man of mature years and accustomed to business. In the case at bar it was a helpless woman, without counsel, overpowered by the most distressing situation that a woman could be placed in, and terrified for the future of her husband, her own future, and that of her little children. The case does not differ in principle from *Baldwin Co.* v. *Savage,* 81 Or. 379 (159 Pac. 80). In that case the agent for plaintiff informed the father of the embezzler that his son had appropriated his employer's money, and that he would be prosecuted unless he could obtain security for the amount embezzled. Here, although more guarded language was used, the implication was the same. In the opinion in that case Mr. Chief Justice MOORE cites with approval *Bentley* v. *Robson,* 117 Mich. 691 (76 N. W. 146), the syllabus of which is as follows:

"A mortgage given by a wife at the instance of her husband, who, unknown to her, had committed a forgery, and thereby defrauded an insurance company, and had upon its discovery been required, though ill,

to accompany an officer from his house, and, after a consultation with the representative of the company and the prosecuting attorney, in which the latter had suggested that he ask his wife to give a mortgage to the company, had returned home in the custody of the officer, accompanied by the assistant prosecutor, and had told her that she would have to sign the mortgage to save him from jail, and which mortgage was signed by her on this assurance, without her knowing the nature of the charge against him, is void for duress, although no threats were employed by the officers to induce its execution."

The cases cited in *Baldwin* v. *Savage*, 81 Or. 379 (159 Pac. 80), tend strongly to support the contention of plaintiff in the case at bar.

The decree of the Circuit Court is affirmed.

Affirmed.

Mr. Justice Moore, Mr. Justice Bean and Mr. Justice McCamant concur.

---

Modified March 27, 1917.

On Petition for Rehearing.

(163 Pac. 987.)

Decree modified on rehearing.

*Mr. Charles A. Johns* and *Mr. Claude M. Johns,* for the petition.

*Messrs. Clarke, Skulason & Clark, contra.*

Department 2.    Opinion by Mr. Chief Justice McBride.

2. In a petition for rehearing it is urged that the $10,000 advanced by the defendants for the purpose of

assisting the Multnomah State Bank of Lents to carry on business was in itself a sufficient consideration to uphold these conveyances. To this it may be answered that, while it may have been consideration so far as Hacon Rostad was concerned, the evidence fails to show that it was any consideration for the execution of the conveyances by Mrs. Rostad, the plaintiff, that she had any clear understanding or knowledge that the $10,000 was to be advanced, or that she received, or was to receive, any benefit from the advancement of this sum. The sole consideration so far as she was concerned was the promise that her husband should not be prosecuted by the officers of the bank, and in making this agreement they "kept the word of promise to the ear, but broke it to the hope," because they well knew that they would be incapable of preventing the prosecution if the matter were reported to the district attorney, as the evidence shows they knew it would be. Besides this the transactions being illegal for the reasons shown in the principal opinion cannot be relieved of their taint of illegality by showing that a portion of the consideration was valuable and in itself legal. Upon this proposition we adhere to our former decision.

3. But there is another matter which escaped our attention while preparing the original opinion, but which upon a reconsideration of the evidence has some bearing, we think, upon the defendants' equities in this case. It is shown that the purchase of lot 6, in block 9, in South Sunnyside Addition to the City of Portland, and in Sycamore Acres, in Multnomah County, was made by Hacon Rostad while the forgeries and peculations by him were being carried on, and that the property was taken and always held in his own name until

lot 6 was conveyed to Henry Harkson; that Henry
Harkson was the owner of the legal title to lot 6 at the
time the conveyance was made to the Oregon Secur-
ities Company. It is further shown that the 29-acre
tract situated in Multnomah County, and known as
Sycamore Acres, was also purchased by him and taken
in his own name and so held until the conveyance to the
Oregon Securities Company. While he says they were
purchased with his own money, it is evident they were
purchased at the expense of the bank of which he was
cashier, and really with money which was practically
stolen from them. Under the circumstances we think
the plaintiff at the time of the conveyances to the
Oregon Securities Company had no equities in this
property, and has none now. The proceeds in justice
ought to go toward reimbursing the bank, which in the
final analysis paid for the property so far as anybody
ever paid for it; and as to these properties the plaintiff
has shown no such equities as entitle her to a cancella-
tion of the conveyances and other muniments of title to
these tracts made by her in December, 1914. As to
the 160-acre tract of land situated in Klickitat County,
Washington, the evidence shows that it was purchased
by Hacon Rostad before the bank at Lents was organ-
ized, and as to that tract Mrs. Rostad has whatever
interest to which she is entitled under the laws of
Washington.

The decree will, therefore, be modified so as to direct
the delivery to her of the notes recited in the principal
opinion and declaring her conveyances of the tract in
the State of Washington and the power of attorney as
to the last-named tract of no effect so far as it relates
to her interest in that tract, but allowing the convey-
ances to stand as to the two parcels of property first

mentioned. The plaintiff will recover her costs in the court below, and neither party will recover costs here.

MODIFIED ON REHEARING.

MR. JUSTICE MOORE, MR. JUSTICE BEAN and MR. JUSTICE McCAMANT concur.