SARAH FOOTE and OTHERS, Appellants, v. LAURA DE POY
and OTHERS, Appellees.

**Divorce:** SUPPORT OF CHILD.  A husband is obligated to provide for
1  his child given into the custody of his divorced wife, but no cause
   of action therefor arises until he has refused to respond to a
   just claim on him for the child's maintenance.

**Duress:** AVOIDANCE OF CONTRACT.  Where a divorced husband, aged
2  and enfeebled in body and mind and under temporary guardian-
   ship, is induced under circumstances indicating an unfair advan-
   tage and coercion to enter into a contract turning over a large
   part of his estate to a trustee for the benefit of a child, the custody
   of whom was awarded his divorced wife and for whom suitable
   provision was made in the divorce proceeding, his heirs at law,
   upon his death, may have the contract cancelled.

**Approval of void contract.**  An order of court approving a void
3.  contract is of no effect, where its validity was not adjudicated.

*Appeal from Linn District Court.*— HON. H. M. REMLEY,
Judge.

FRIDAY, JANUARY 13, 1905.

THE opinion states the case.— *Reversed.*

*Deacon & Good,* for appellants.

*Rickel, Crocker & Tourtellot,* for appellees.

WEAVER, J.— On June 24, 1896, William De Poy, a widower of advanced age, and Clara Knapp, both of Linn county, Iowa, were united in marriage. By his former marriage De Poy had become the father of several children, plaintiffs herein, and there was born to him of the second marriage, a daughter, who is the defendant Laura De Poy. On September 10, 1901, Clara De Poy obtained a decree of divorce from her husband, and by the same decree was awarded the custody of the child, Laura, and alimony in the sum of $2,000, and attorney's fees. A little less than two months later the divorced wife began proceedings against her former husband, alleging that he had become enfeebled in body and mind, a prey to sharpers and abandoned women, and was wasting his estate, and, on these allegations, procured the appointment of a temporary guardian to take charge of the property. Immediately upon this action being taken, De Poy became very solicitous to obtain a dismissal of the proceedings against him, and visited his former wife to secure some sort of a settlement or compromise. As a result of these negotiations an agreement was finally reached whereby the district court was to appoint a trustee, whom De Poy should pay $1,500 for the benefit of the child, Laura, and should also convey to her, or to the trustee for her use, certain town lots then owned by him. The money and property thus surrendered proved to be by far the larger part of the entire estate left to him after satisfying the judgment for alimony and paying off existing debts and incumbrances. The agreement, which was reduced to writing and approved by the court, does not in so many words provide that upon turning over the money and property the guardianship proceedings should be dismissed; but such an understanding is clearly to be implied therefrom, and such was the course of action pursued by the parties. The proceedings were continued in force, and the guardian remained in control of the

estate, until some time in December, when De Poy, through agents, made a sale of his equity in a farm for the purpose of raising the money with which to pay the $1,500. The money was then by the purchaser of the land deposited with the clerk of the district court, " to be used for the purpose of releasing the temporary guardianship of William De Poy." The payment being made, the guardian was discharged and De Poy was restored to the remnant of his estate. Soon thereafter the older children of De Poy, or some of them, instituted new proceedings for the appointment of a guardian over him, and in April, 1902, death kindly intervened in the old man's behalf. This action was then begun to set aside the trust arrangement made by the deceased; as hereinbefore stated, on the ground that at the date thereof he was mentally incompetent to make a contract, and that the trust agreement was obtained by fraud and duress. The district court found for the defendants, and dismissed the petition, and plaintiffs appeal.

No one, we think, can read the record in this case, and not be strongly impressed with the conviction that William De Poy at the time of this transaction was at least very much weakened in body and mind. Whether his imbecility had so far progressed as to wholly incapacitate him from making a valid contract, if left to act freely and without undue influence of any kind, is not perhaps so clear, and we think it not necessary to decide. It is very clear that he was sufficiently weak to be the easy mark of imposition, and that his former wife, by taking advantage of that weakness, and by holding the guardianship over him *in terrorem,* obtained an agreement which was essentially unconscionable. In the divorce proceeding, then but just ended, she had been awarded alimony, fixed, as we must presume, in due proportion to the husband's financial condition, and with reference to the fact that she was to have the custody of the child. To pay that alimony, De Poy added another to the numerous incumbrances on his property.

1. DIVORCE: support of child.

While the divorce did not cancel his obligations as a parent, there was no present occasion justifying a demand upon him for further immediate contribution to the child's support, and certainly the law recognizes no right in the child or in the divorced wife to compel him to set aside the greater part, or, indeed, any part, of his estate to provide against such child's future needs. It was to be presumed that if, during his lifetime, his young daughter should present any just claim upon him for her maintenance or education, he would respond thereto in proportion to his ability and her needs; and until he refused so to do, neither she, nor any one for her, had any right of action against him.

In his weakened condition, De Poy was naturally much agitated over the guardianship proceedings. In his anxiety, he·appears to have been ready to· consent to almost any sacrifice to effect that purpose, and his former wife seems to have been willing to reap all the advantage to be derived from the situation. Of the fact that the old man's surrender of the bulk of his estate to the trustee was the price of his liberation from guardianship, there can be no doubt. Such as we have already said, is the plain implication, though not the express terms, of the written agreement. Even in the absence of the writing, the admission of the former wife and of the counsel who assisted in the so-called settlement that it was the agreement or understanding that the guardianship proceedings should be dropped upon payment of the money, and the further fact that, as soon as De Poy had complied with the demand, he was promptly released, would force us to the same conclusion. Indeed, the whole story of the transactions from the inception of the proceedings until the discharge of the guardian,⁎ is full of circumstances all tending to show· that, while De Poy was quite evidently a fit subject for guardianship, the purpose of his former wife in instituting the proceedings was not to save the property for his use and support in his old age, but to obtain the largest possible por-

2. DURESS: avoidance of contract.

tion of his remaining estate for the benefit of her daughter, and when that purpose was accomplished her interest in the proceeding ceased.

It is suggested that, even if it be found that De Poy was to some extent of weakened mind and impaired judgment, he had the assistance of counsel, and we must assume that his interests were properly protected. We are not able to say from the record just what benefit or protection he had in this respect. Mr. J. H. Crosby testified that he is a practicing lawyer, and was consulted by De Poy. As a witness, he relates the interviews had with his client, and tells us that he himself arranged with opposing counsel, subject to the approval of De Poy and the court, for the payment of $1,500, and that, upon such payment being made, the matter was to be dropped. It is Mr. Crosby's opinion that his client had sufficient " mental grasp to understand ordinary business," but, if such were the case, and he was not properly the subject of guardianship, it is not easy to understand why counsel should have thought it necessary to advise the payment of $1,500 to secure the withdrawal of a proceeding which would have been quickly dismissed by the court upon a showing of his client's mental competency. On the other hand, if the client was mentally incompetent, it is equally certain that no court would have entered any order depriving him of the property in the manner provided for in this contract. Indeed, the testimony upon this feature of the case only adds weight to our conviction that counsel was mistaken in his estimate of the mental condition of his client, and that the contract was entered into under circumstances which demand its avoidance.

It is true that the claim of duress, in the original and technical sense of physical restraint, or actual or apprehended personal violence, is not proven. But there is a modified form of the doctrine of duress, recognized quite generally by the courts of this country, which operates to render void a contract exacted by a threatened illegal destruction or

loss or withholding of property. Mr. Cooley, in his work
on Torts, p. 506, states the modern definition as follows:
" Duress is a species of fraud in which compulsion in some
form takes the place of deception in accomplishing the injury.
Duress is either of the person or of the goods of the party.
*   *   *   Duress of the goods consists in seizing by force,
or withholding from the party entitled to it, the possession of
personal property, and extorting something as a condition
of release, or in demanding and taking property under color
of legal authority, which in fact is either void, or for some
other reason does not justify the demand." It has been said,
in an opinion applying this principle, that " artifice and force
differ only as modes of obtaining the assent of a contracting
party, and a contract to which one assents through imposition
or overpowering intimidation will be declared void on appeal
to either a court of law or equity to enforce it. The question
whether one executes a contract or deed with a mind and
will sufficiently free to make the act binding is often difficult
to determine, but for that purpose a court of equity, unre-
strained by the more technical rules which govern courts
of law in that respect, will consider all the circumstances
from which rational inferences may be drawn, and will refuse
its aid against one who, although apparently acting volun-
tarily, yet in fact appears to have executed a contract with
a mind so subdued by harshness, cruelty, extreme distress, or
apprehensions short of legal duress, as to overpower and
control the will." *Central Bank v. Copeland,* 18 Md. 305
(81 Am. Dec. 597).

It has also been held that duress of property is a good
plea to an action on a bond given under hard and pressing
circumstances to secure the release of property seized in at-
tachment proceedings oppressively instituted or conducted.
*Collins v. Westbury,* 2 Bay, 211 (1 Am. Dec. 643); *Chandler
v. Sangler,* 114 Mass. 364 (19 Am. Rep. 367); *Spairds v.
Barrett,* 57 Ill. 289 (11 Am. Rep. 10); *Hackley v. Headley,*
45 Mich. 569 (8 N. W. Rep. 511). See also, *Carson v.*

*Patterson,* 33 Cal. 334; *Oliphant v. Markham,* 79 Tex. 543 (15 S. W. Rep. 569; 23 Am. St. Rep. 363) ; *Riggs v. Wilson,* 30 S. C. 172 (8 S. E. Rep. 848) ; *White v. Heylman,* 34 Pa. 142; *Crawford v. Cato,* 22 Ga. 594; *Vyne v. Glenn,* 41 Mich. 112 (1 N. W. Rep. 997), 2 Greenleaf evidence, section 121; *Adams v. Schiffa,* 11 Colo. 15 (17 Pac. Rep. 21; 7 Am. St. Rep. 202) ; *R. Co. v. Pattison,* 41 Ind. 312; *Radich v. Hutchins,* 95 U. S. 210 (24 L. Ed. 409) *Cleaveland v. Richardson,* 132 U. S. 318 (10 Sup. Ct. Rep. 100; 33 L. Ed. 384) ; *Chamberlin v. Reed,* 13 Me. 357 (29 Am. Dec. 506) ; *Joannin v. Ogilvie,* 49 Minn. 564 (52 N. W. Rep. 217; 16 L. R. A. 376; 32 Am. St. Rep. 581).

The rule to be deduced from these cases is especially applicable where the party on whom the imposition is alleged to have been practiced is, by reason of mental or physical infirmity, more easily influenced to act to his own injury. *Walbridge v. Arnold,* 21 Conn. 424; *Blair v. Coffman,* 2 Overt, 176 (5 Am. Dec. 659). In this respect the principle is closely related to that which is so frequently applied in avoiding contracts procured by undue influence. Indeed, undue influence may well be defined as moral duress or coercion. That William De Poy acted under such coercion, and was thereby led to make a contract which he would not have made if left to act of his own free will, there can be no reasonable doubt. By the proceedings against him he had been deprived of the right to possess and control his own property — a deprivation which it was threatened to make permanent. He was exceedingly desirous to avoid this result, and to be restored to the control of at least some portion of his estate, and, in his weakness, yielded to the plan of his release upon the terms tendered by the persons holding him at such disadvantage.

The order of the court approving the contract can have no effect in the premises. The court had no jurisdiction to order any disposition of the ward's property. No proceedings for such purpose were pending. If the contract was

valid, it did give the court the jurisdiction to appoint a trus-
tee to receive the property, but the legal validity
of that contract was in no manner considered
or adjudicated.  That question was first pre-
sented in the case now before us, and finding, as we do,
that it was obtained under circumstances amounting to moral
compulsion — the overpowering of a will which had been
materially weakened by mental decay — we think it should
be set aside and held for naught, and that the trustee in pos-
session of the property should be held to account for and
surrender the same to the administrator of the estate of Will-
iam De Poy.

3. APPROVAL OF VOID CONTRACT.

In reaching this conclusion, we may say it is very prob-
able that no person active in securing the contract was moved
by any malicious or wanton purpose to harass or despoil this
feeble and broken old man.  It may, indeed, be assumed
that the divorced wife believed he was liable to waste or
dispose of the remnant of his property, and that her motive
in instituting the proceedings and obtaining the contract was
not to enrich herself, but to obtain the best possible provision
for her child.  The motive was laudable enough, but the
means by which that end was accomplished cannot be up-
held.  William De Poy was either mentally competent or
incompetent.  If competent, and the proceedings against him
were begun to compel him to give up a part of his property,
it was a flagrant abuse of the machinery of the law for the
purpose of securing an unconscionable advantage.  If he was
incompetent, then a contract obtained from him, to his dis-
advantage, while he was actually under guardianship, by the
very person who instituted the proceedings upon her solemn
declaration that he was mentally unfit to transact business,
can be viewed with no favor in a court of equity.

For the reasons stated, there must be a reversal, and the
cause is remanded to the district court for the entry of a
decree in harmony with this opinion.— *Reversed.*