### WELCH v. BEECHING.

1. CONTRACTS—PAYMENT—THREATS.
    Where plaintiff brought suit against defendants to recover a payment alleged to have been made under threat of litigation for the debts of a banking copartnership, for which she was not liable, on account of coverture, testimony relating to the environment of the plaintiff, and that she supported herself and her children, whose number and age she described, was not improperly admitted.

2. SAME—ATTORNEYS—DURESS—TORTS.
    An attorney for defendant, who started the action for equal share of the proceeds, was correctly made a party defendant and the court rightly declined to direct a verdict for him.

3. SAME—DEFINITION—CONTRACTS.
    Duress exists where one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will: it may be defined as an unlawful restraint, intimidation, or compulsion resulting in the doing of some act contrary to the will or inclination of the doer.

4. SAME—GOOD FAITH—COVERTURE.
    And although defendant and his attorney may have supposed they were entitled to start the action, they were not

excused from liability to a woman, away from home, sick or indisposed, threatened and informed by the lawyer that the law would be invoked against her if she did not pay the claim, and who paid under the fear excited by the threats.

Error to Van Buren; Des Voignes, J. Submitted June 14, 1916. (Docket No. 109.) Decided September 27, 1916.

Assumpsit by Minnie E. Welch against Charles Beeching and Earl L. Burhans to recover a payment made under duress. Judgment for plaintiff. Defendants bring error. Affirmed.

*David Anderson* and *Wm. J. Barnard,* for appellants.

*Glenn E. Warner,* for appellee.

MOORE, J. This action was begun in justice's court, and an appeal was taken from the judgment there rendered. On the trial in the circuit court the circuit judge directed a verdict in favor of defendant Crankshaw, and the jury returned a verdict upon which judgment was entered in favor of plaintiff against defendants Beeching and Burhans in the sum of $150. The case is brought here by writ of error.

Before March, 1914, there was a bank known as the Farmers' & Merchants' Bank of Lawrence, Mich. The members of the bank were Mrs. Angie Clark, James H. Baxter, James L. Welch, and Minnie E. Welch, the plaintiff in this case, who was the wife of James L. Welch. The plaintiff was not an active member of the company, and had nothing to do with the management of the bank. March 30, 1914, a receiver for this bank was appointed.

Dr. Daune W. Crankshaw resided at Lawrence, Mich., and he desired to purchase a piece of land for-

merly owned by James L. Welch and Minnie E. Welch
as tenants by the entireties, which had been conveyed
to H. L. Thornburg. Mrs. Welch represented Mr.
Thornburg in making the sale. She received the deed
from Mr. Thornburg which she delivered to Dr. Crank-
shaw, and he submitted it to attorney Earl Burhans
with the letter from Mr. Thornburg. Mr. Burhans
learned from the letter that Dr. Crankshaw was pur-
chasing the property for $800, of which $200 was to
be loaned by Mr. Thornburg to Mrs. Welch. Mr. Bur-
hans began in the circuit court an action wherein
Charles Beeching was plaintiff and Minnie E. Welch
defendant, and another suit against Dr. Crankshaw as
garnishee defendant. Charles Beeching was an un-
secured creditor of the Farmers' & Merchants' Bank.

After the papers in the suits were issued Mr. Bur-
hans, who was prosecuting attorney, and the sheriff,
went with the papers to Lawrence and to the office of
Dr. Crankshaw. A conference was held in the private
office of the doctor, after which the sheriff, in com-
pliance with the request of Mr. Burhans, went to the
home of Mrs. Welch and brought her in an automobile
to the office of Dr. Crankshaw. What occurred there
according to the version of the plaintiff appears in her
testimony, which was, in substance, as follows:

"I am the plaintiff in this case; am wife of James
L. Welch, and at present am living in Indianapolis.
My husband was a member of the banking house
known as the Farmers' & Merchants' Bank of Law-
rence. The members of that banking company were
James L. Welch, J. H. Baxter, Angie L. Clark, and
myself. I never had anything to do with the active
management of the bank. The bank failed March 26,
1914. We moved to Indianapolis June, 1915. I was
back in Lawrence in August, 1915, and negotiated the
deal of this real estate to Dr. Crankshaw. Mr. Thorn-
burg told me that I could sell the property for $1,000.
I talked with Dr. Crankshaw about my circumstances
and why I wanted the money, and I said: 'If you

will give me $1,000 for that property I am to have
$200 for selling it.' He told me to write Mr. Thorn-
burg that he would give $800. I had arranged with
Mr. Thornburg to get $200 for commission and borrow
$200 of Mr. Thornburg, and I talked it over with the
doctor, and decided that by selling it for the $800 and
losing my $200 commission that it would put me in
position to borrow $200. So I wrote Mr. Thornburg.
After some negotiations it was agreed that Dr. Crank-
shaw could have this property from Mr. Thornburg
for the $800; $200 to be paid in cash. On August 5th
the doctor gave me $25 earnest money.

"*Q.* After the failure of this bank, tell the jury what
you did to support yourself.   *   *   *

"*A.* I nursed for Dr. Crowell whenever I could work.
I took care of Mrs. Moon out in the country, and
nursed at George Schafter's, and nursed a case in
Chicago.

"*Q.* As to the condition of your health on the 17th
day of August and still prior to that time, had you been
under the care of Dr. Crankshaw?

"*A.* I had.

"*Q.* And in your custody how many children did you
have?

"*A.* Three.

"*Q.* How old are these children?

"*A.* One 17, one 14, and one 10.   *   *   *   I think
school was going to open in Indianapolis August 27th.
I wanted to get home as soon as I could as soon as this
deal was put through, because I didn't know whether
the children had to register, and I wanted to get back
as soon as I could to get ready for school. I saw Dr.
Crankshaw at the post office on the morning of August
17th. He said Burhans was coming down and would
bring down some papers, and said: 'There is some
little entanglement I don't just understand what it is,
but Burhans is coming down, and we will send for
you when he gets here.' I went back home, and later
Mr. Beattie came to the house with an automobile,
and I went to Crankshaw's office with him. In the
front room he introduced me to Dr. Emery and Mr.
Beattie, and I sat down in the front office. In a few
minutes Dr. Crankshaw asked me into the private
office. In there Mr. Burhans explained the title to me,

and I became a little nervous, and I said: 'What am I to do, then, to get back tomorrow? I am not going to get the children to school.' And Burhans, hitting the arm of the chair, he says he would advise Dr. Crankshaw not to put any good money into this until he gets some good paper. I said: 'Well there is plenty of time to get that. Suppose you keep the remainder and pay me the balance of the $200, and then I can go, and the remainder can be sent when this is straightened up.' Then Mr. Burhans said: 'Mrs. Welch, I have something that is not pleasant to tell you now, and I don't want you to get nervous.' And then he stated that he had started a suit to tie this money up so that I couldn't get it. And I said: 'Why, how is that?' * * * And I said: 'Mr. Burhans, if you knew that this was taking this from my children's mouths, the food that I need to feed them, would you take this just the same?' And he said: 'Mrs. Welch, there is also a little man out here in the country that has worked hard in the hot sun and tied up his money, and you have tied up his money in this bank over here.' I asked him who, and he went on and explained quite a little bit before he told me it was Mr. Beeching. Of course, I was frightened and I was very nervous—

"*Q.* Did you tell Mr. Burhans you were nervous?

"*A.* Well, they could see it. The doctor knew I was not well. I said: 'Doctor'—No; I said: 'Well, then, if that is the case, let's call the deal off, and I won't try to sell it; let Thornburg attend to his own business.' 'No,' he says, 'you can't do that; the doctor has bought it, paid $25 on it.' And then I waited a minute, and I said: 'Doctor, would you loan me $25? I must go back, and you know I haven't got any money; I told you so a little while ago.' And doctor kind of said: 'Y-e-s.' And Mr. Burhans then said: 'Well now, Mrs. Welch, I would rather give to you $25 than to give it to the court, and you needn't borrow that $25; if we can come to some negotiations here, we will pay you $25 of it.'

"*Q.* During that time did you say anything about fighting that case?

"*A.* I can't tell just when I said it, but I did say: 'If I was well I would fight this to a finish.'

"*Q.* Was anything said to you by Mr. Burhans about your liability for the debts in the bank?

"*A.* Yes; he said when he was tapping on the chair and talking to me, he said: 'You are liable for the debts of this bank. You are a partner in this old firm and you are liable for its debts.' Of course, I won't dispute his word, but it seems to me that that was when I said to him: 'Why, Mr. Burhans, do you mean to say that they can also take my wages from my work if I go out and nurse?' And he explained that matter to me somewhere as he says he did.

"*Q.* Did you believe that statement and rely upon that statement that he made that you were liable for the debts of that firm?

"*A.* Well, I was so frightened I don't know what I did think, hardly. I never had had the sheriff or prosecuting attorney come after me before, and I was frightened.

"*Q.* Did you say anything further to him about declaring the deal off or about getting the children back to school?

"*A.* That was about all that was said, as I can remember about that. But he advised me that he was not my attorney, that he was against me, and that I better get counsel.

"*Q.* Now, Mr. Burhans said that you told him that this was not the first one of these debts that you settled. Did you say anything like that?

"*A.* When I was leaving the office to go out the back door, and they had all said 'Good bye' to me, I said: 'This is not the first debt that I have paid.' I didn't mean though in connection with the bank. I meant personal debts, and I have paid every one to my knowledge. We have managed to pay all little debts by close managing, except a little grocery bill at Albert Abrams', and he refused to take it. That is what I mean; I meant personal debts.

"*Q.* Now, do you recall anything further which was said or done there in Dr. Crankshaw's office before these checks were turned over?

"*A.* Well, about the time it was proposed not to— for to give me $25 there, Mr. Burhans said: 'Get out your check book, Doc.' And the doctor got out his check book, I remember that; but it seems to me that

the checks were laid on the arm of my chair. We all sat right there, and it seems to me I wrote it right there. I can't remember exactly. I was awfully excited and frightened. But I know that I signed those checks. They told me which one to sign or to hand to Mr. Burhans and which one for me to keep.

"*Q.* And all you received of the $175 was $25?

"*A.* Out of the $175; yes, sir.

"*Q.* Which way did you leave the office?

"*A.* Out the doctor's back door.

"*Q.* Were you crying at the time, as the doctor testified?

"*A.* Yes, sir; I didn't want to go out on the street."

On the cross-examination she testified:

"Mr. Burhans some time in the proceedings said that he had something to say that was not pleasant, and told me that he had started a suit against me.

"*Q.* And he told you that he believed he had a right to hold the whole $800, didn't he?

"*A.* Well, he said so much, and I was so excited I couldn't tell you the exact words, but to that amount.

"*Q.* Didn't he tell you he believed he had a right to hold the whole $800?

"*A.* Yes, sir; he did.

"*Q.* And that he believed that Mr. Thornburg really never was the owner of that property?

"*A.* And I told him that I had counsel from Mr. Cavanaugh that it was perfectly legal to sell the property before I sold it.

"*Q.* And did you tell him that you had counsel from somebody else?

"*A.* Yes; I think I did. I mentioned Judge Mills, because I did talk with Judge Mills about it.

"*Q.* And you told Mr. Burhans that you had counsel, and that you did have a right to sell it?

"*A.* Yes, sir; it was joint property. And I stated to him furthermore, I said: 'Mr. Burhans, that was bought with the money that the old Stearns farm sold for, property that I had when I was a girl, the place where I lived when I was a girl.'

"*Q.* Well, the point is this: Mr. Burhans said that he thought he had a right to hold the whole $800, and you thought he didn't have a right to hold it all?

"*A.* Yes, sir; I was indignant about it.

"*Q.* Isn't it right then and there, when you was talking about the $800, that you said you would fight it, if you ever said this?

"*A.* I couldn't say when it was. I couldn't say positively, but I know I said it.

"*Q.* What would be your recollection as to whether or not it was not when he was talking about holding the whole $800?

"*A.* I said to him that this was not done with my own free will; if I was well I would fight it to a finish.

"*Q.* Now that is when he was talking about holding the $800?

"*A.* I can't say now. I won't say positively, but it would seem to me it was almost before I was leaving, and after—My memory is now that Mr. Beattie was in the room when I said that. I think Mr. Beattie was in the room when I said that. Now, I won't say positively about that, because I can't remember.

"*Q.* Well, anyway, you said that if you was well that you would fight the case?

"*A.* Yes, sir; I furthermore said—looked at the doctor and told him that he knew I was not well.

"*Q.* From that you meant that you didn't believe that you were liable; is that a fact?

"*A.* I don't know what I did believe now.

"*Q.* If you had been well, you would have fought the case?

"*A.* Yes, sir; I would.

"*Q.* On the ground that you were not liable?

"*A.* But I felt that I must get back to Indianapolis, and I had got to save my children."

There was much more of her testimony than what we have quoted. Dr. Crankshaw and Mr. Burhans were called as witnesses by the plaintiff. There were other witnesses sworn. We have quoted from the testimony of the plaintiff because, if she is entitled to have her case go to the jury at all, it must be because of her testimony.

It is now agreed by all of the parties that, because plaintiff was a married woman, she is not liable to the creditors of the bank for its debts. It should be said

that Mr. Burhans claims he supposed he had the right to commence the suits he did commence, and to make the statements he did make about the plaintiff being liable for the debts of the bank.

Errors relied upon are stated by counsel as follows:

(1) Permitting plaintiff to testify as to how she had supported herself and as to the number and ages of her children.

(2) The refusal of the court to direct a verdict in favor of Beeching, or Burhans, or both, as asked for at the close of plaintiff's case.

(3) Refusal and failure to give defendants' requests to charge the jury.

(4) Errors in the charge as given.

We will take these up in the order presented:

1. It will appear later in this opinion that it is proper in these cases to show the environment of the person upon whom it is claimed duress has been practiced.

2. Mr. Burhans' testimony shows that he arranged to take the claim of Mr. Beeching upon shares, each to have one-half of what was realized. If the case was to go to the jury at all it should be submitted against both of the remaining defendants.

The remaining assignments may be considered together.

The charge of the court was very long. In it appears the following:

"It is the claim of the plaintiff that she was induced to pay the sum of $150 by duress, and I instruct you that duress exists when one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will. Mere apprehension of threats of a civil proceeding or suit based on a summons and garnishment process in a civil proceeding to enforce a claim unaccompanied by any act of hardship or oppression does not render a payment in re-

sponse thereto involuntary in the sense that it can be recovered back.

"The question in this case is not, Did Beeching have a claim he could enforce if the suit had gone forward? The question is, Did he, through Attorney Burhans, coerce Mrs. Welch; that is, put her under duress so she was not able to exercise her own free will and agency and thereby was the payment rendered involuntary? If she was not deprived of her free will and agency, then the payment was voluntary, and your verdict should be no cause of action. To constitute duress it is not necessary that physical force be used. Duress is either of the person or of the property of a party, and if you believe from the evidence that, although no force was used, yet if by unlawful acts Mrs. Welch was induced to pay over the money under circumstances which deprived her of the exercise of free will, then I instruct you that the same was such duress as entitles her to maintain this action. In determining the question of duress, sex, age, state of health, and financial condition of the plaintiff should be considered. You have a right to inquire, Is the plaintiff strong and robust or nervous and irritable, and what effect, if any, did that have? Was she under all the circumstances in that condition of mind whereby she exercised a voluntary volition, free, and not under the coercion of others.

"The plaintiff in this case claims that the money involved was paid by her to Mr. Burhans under what is known in the law as duress; that is, the circumstances were such that she was not acting voluntarily and of her own free will in paying over this money to Burhans on the claim asserted against her.

"I instruct you, gentlemen, that if a claim is presented against a person, and that person voluntarily pays the claim, the money cannot be recovered back simply on the ground that it could not have been legally enforced had the person seen fit to contest the matter rather than pay it. So in this case, if Mrs. Welch saw fit to pay or settle this claim as she did rather than have a lawsuit, or in preference to the notoriety and publicity which would follow a contest, and that she was acting free and of her own volition, then she cannot recover it back, and your verdict should be for the defendant.

"If you find from the evidence that the defendant Burhans did not do anything or say anything which tended to frighten Mrs. Welch or give her cause to think that her person was in danger, or that her property or rights were in danger, but if, on the other hand, he only told her he had a claim for Mr. Beeching and had started a suit thereon, and would have a summons served on her and garnishment served on Dr. Crankshaw, and if he did not urge her to pay or to make settlement, but, on the contrary, told her he could not advise her, and that there was no hurry in the matter, and she had better take time and get counsel and advice, and she paid the money rather than take time and get counsel or to avoid notoriety and publicity, or the trouble and expense of a lawsuit, then she cannot claim to have been coerced, or that the payment was involuntary, and your verdict must be for the defendant. * * *

"The plaintiff has the burden in this case of satisfying you by a preponderance of the evidence of the elements of her claim. In arriving at the question whether the plaintiff has established her case by a preponderance of the evidence, you are not confined to evidence introduced on either side of the case. You may rely upon any evidence in the case; it matters not which party introduced it if it is sufficient to satisfy you of the fact and so proven by a preponderance of the evidence. * * *

"As I have just said to you, gentlemen, this is purely a question of fact, as it is now presented, and may be determined in these few words: Finally the question here is one of fact, namely, under the evidence, if Mrs. Welch exercised a free agency in what she did in the doctor's office when the check for $150 was signed by her in the office of Dr. Crankshaw whereby the money went to defendant, if she had an opportunity to consider the matter, was advised of her rights, and knew and understood what she could do, and then chose the course taken as a result of a free agency, of her own volition, of her own free will, then plaintiff cannot recover, and you will return a verdict in favor of the defendant of no cause of action.

"Upon the other hand, gentlemen, if you find under the evidence there was a want of free agency, in what

Mrs. Welch did in the doctor's office when the check for $150 was signed by her whereby the money went to defendant, she having no opportunity to consider the matter, that she was not advised of her rights, and did not know or understand her rights, and as a result she was deprived of a free agency, and the act done was not the exercise of a free volition, her own free will, then plaintiff is entitled to recover, and you will so say by your verdict."

The law of duress has been gradually undergoing modifications. In a recent work discussing the modern doctrine it is said:

"According to this view, what constitutes duress is matter of law; whether duress existed in the particular transaction is usually matter of fact, though, of course, the means may be so oppressive as to render the result an inference of law. There is no legal standard of resistance with which the person acted upon must comply at the peril of being remediless for a wrong done to him, and no general rule as to the sufficiency of facts to produce duress. The question in each case is: Was the person so acted upon by threats of the person claiming the benefit of the contract for the purpose of obtaining such contract as to be bereft of the quality of mind essential to the making of a contract, and was the contract thereby obtained? Under this theory duress is to be tested, not by the nature of the threats, but rather by the state of mind induced thereby in the victim. The means used to produce that condition, the age, sex, state of health, and mental characteristics of the alleged injured party, are all evidentiary, merely, of the ultimate fact in issue, of whether such person was bereft of the free exercise of his will power. Obviously what will accomplish this result cannot justly be tested by any other standard than that of the particular person acted upon. His resisting power, under all the circumstances of the situation, and not any arbitrary standard, is to be considered in determining whether there was duress." 9 R. C. L. p. 716.

It is said:

"Duress exists where one by the unlawful act of another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will. *City National Bank* v. *Kusworm*, 91 Wis. 166 (64 N. W. 843, 845); *Wolff* v. *Bluhm*, 95 Wis. 257 (70 N. W. 73, 74, 60 Am. St. Rep. 115); *Batavian Bank* v. *North*, 114 Wis. 637 (90 N. W. 1016, 1019); *Philipps* v. *Henry*, 160 Pa. 24 (28 Atl. 477, 478, 40 Am. St. Rep. 706); *Peabody* v. *Tenney*, 18 R. I. 498 (30 Atl. 456, 457); *Newburyport Water Co.* v. *City of Newburyport* (C. C.), 103 Fed. 584, 594; *Hackley* v. *Headley*, 45 Mich. 569 (8 N. W. 511, 512). It may be defined as an unlawful restraint, intimidation, or compulsion of another to such an extent and degree as to induce such person to do or perform some act which he is not legally bound to do, contrary to his will and inclination. It is obvious that if the act is done contrary to the will and inclination of the injured party it cannot be in the exercise of his free will. His will is subjected to that of another, and he is compelled to submit to an illegal exaction because of the dominant power. *First National Bank* v. *Sargeant*, 65 Neb. 594 (91 N. W. 595, 597, 59 L. R. A. 296)." 3 Words and Phrases, p. 2268.

Again:

" 'Duress,' under the decisions, means a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party, and causes him to do an act or make a contract, not of his own volition, but under such wrongful external pressure. Whether such external pressure or influence is sufficient to destroy the free agency of a party is a question to be determined by the age, sex, intelligence, experience, and force of will of the party, the nature of the act, and all the attendant facts and circumstances. *Pride* v. *Baker* (Tenn. Ch. App.), 64 S. W. 329, 332 (citing *Willard* v. *Willard*, 65 Tenn. (6 Baxt.) 297 (32 Am. Rep. 529)." 3 Words and Phrases, p. 2269.

In *Hackley* v. *Headley*, 45 Mich. 569 (8 N. W. 511), Justice Cooley, speaking for the court, said:

"Duress exists when one by the unlawful act of

another is induced to make a contract or perform some act under circumstances which deprive him of the exercise of free will.  *  *  *

"And the mere threat to employ colorable legal authority to compel payment of an unfounded claim is such duress as will support an action to recover back what is paid under it. *Beckwith* v. *Frisbie*, 32 Vt. 559; *Adams* v. *Reeves*, 68 N. C. 134 [12 Am. Rep. 627]; *Briggs* v. *Lewiston*, 29 Me. 472; *Grim* v. *School District*, 57 Pa. 433 [98 Am. Dec. 237]; *First National Bank* v. *Watkins*, 21 Mich. 483."

See, also, *Cribbs* v. *Sowle*, 87 Mich. 340 (49 N. W. 587, 24 Am. St. Rep. 166), and *Bentley* v. *Robson*, 117 Mich. 691 (76 N. W. 146); *Foote* v. *De Poy*, 126 Iowa, 366 (102 N. W. 112, 68 L. R. A. 302, 106 Am. St. Rep. 365).

We have not overlooked *Beath* v. *Chapoton*, 115 Mich. 506 (73 N. W. 806, 69 Am. St. Rep. 589), and *Voorhees* v. *Nelson*, 189 Mich. 684 (155 N. W. 708), but in these cases legal authority was not used to enforce an unfounded claim.

We have in the instant case a woman away from home, confronted with an unexpected situation, told by a lawyer that the law could be successfully invoked and would be invoked against her unless the money was paid. It is now admitted that, however honestly these statements may have been made, they were not true. The woman says she was sick, nervous, and frightened, and did not know what to do.

Under the authorities cited we do not think the trial judge could dispose of the question as a matter of law, but that he properly submitted it to the jury.

Judgment is affirmed, with costs to the plaintiff.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred.