H. M. SMITH, Appellee, v. BLAKESBURG SAVINGS BANK, W. J. STECKEL, Appellant, et al.

**TRIAL:** Method of Trial—Duress in Execution of Deeds—Damages.
1   An action for damages by reason of the alleged duress of the defendant in causing the execution by plaintiff of real estate deeds has no place on the equity side of the calendar.

**ELECTION OF REMEDIES:** Right of Election—Duress—Rescission or Damages. Principle recognized that he who is the vic-

tim of duress in the execution of real estate deeds may elect whether he will proceed (a) in equity for cancellation, or (b) at law for damages.

FRAUD:   Actions—Duress—Trial—Jury Questions.   On a plea of duress, the questions whether plaintiff's free agency was overcome and whether the influence of such alleged duress continued until the full consummation of the transactions, are, under a conflict of evidence, necessarily jury questions.

EVIDENCE:   Relevancy, Competency, and Materiality—Fraud and Duress—Transactions Showing Situation, Etc., of Parties.   On a plea of duress in the execution of deeds, the entire transaction, and all those connected and related thereto, are admissible, as bearing on the situation, relations, and intentions of the parties.

WITNESSES:   Impeachment—Same Witness Called by Both Parties. A party who has, on direct, called a witness in his own behalf, and interrogated him as to one subject-matter, may, when said witness is later called, on direct, by the adverse party, and interrogated as to *another* subject-matter, impeach such witness as to such *latter* subject-matter by showing statements of the witness out of court, inconsistent with his statements in court.

TRIAL:   Verdict—Special Interrogatories—Unsupported Answers— Effect.   An answer by the jury to a special interrogatory, which answer is apparently in flat contradiction to conceded evidence, will not constitute ground for reversal, when such answer can, nevertheless, be harmonized with the theory upon which the cause is correctly tried.   .

TRIAL:   Argument of Counsel—Misconduct—Incomplete Record.   It is futile to predicate error on alleged misconduct not shown by the record.

FRAUD:   Actions—Evidence—Sufficiency.   Evidence, in an action for damages by reason of duress in the execution of deeds, reviewed, and held sufficient to support the verdict rendered.

*Appeal from Davis District Court.*—C. W. VERMILION, Judge.

OCTOBER 20, 1917.

REHEARING DENIED FEBRUARY 17, 1918.

ACTION for damages.   Verdict in favor of the defend-

ant King, and against the defendant W. J. Steckel, for $9,361.65. From a judgment rendered against him thereon, defendant Steckel appeals. The facts are stated in the opinion.—*Affirmed.*

*Payne & Goodson,* for appellant.

*Bray, Shifflett & Wilkie,* for appellee.

STEVENS, J.—In his original petition, plaintiff charged the defendants, the Blakesburg Savings Bank, Walter Abegg, Herbert King, and W. J. Steckel, with conspiring together for the purpose of cheating and defrauding him out of his property. During the progress of the trial, plaintiff dismissed his cause of action against the bank and Abegg, and filed an amendment to his petition, alleging that the remaining defendants, by reason of various transactions, had, in furtherance of said conspiracy, and by duress, induced him to convey all of his personal property to Steckel, and the real property to Belle H. Steckel, on January 24, 1914, without adequate compensation.

While engaged in the stock business at Bloomfield, Iowa, plaintiff became indebted to the Blakesburg Savings Bank on account in a large sum; resulting, on June 23, 1913, in the entry of a judgment against him in favor of said bank, for $10,443.14. On the same day, judgments were entered against him in favor of the Ottumwa National Bank for $897.22, and in favor of Clara Gamble for $404.92.

Some time prior to the rendition of the judgment in favor of the Blakesburg Bank, plaintiff employed the defendant Steckel to examine his account with the bank, for which service he agreed to pay him $500.

On January 24, 1914, plaintiff executed two deeds, a warranty and a quitclaim, conveying his farm to Belle H. Steckel, and a bill of sale conveying his personal property in blank, but for the benefit of W. J. Steckel. It is on this occasion that plaintiff claims that W. J. Steckel, Her-

bert King, and a man by the name of Corrick, came to his premises about noon, and remained until after midnight, and that, while negotiating for the above conveyance, Steckel falsely represented to plaintiff that he had brought a receiver with him, and threatened that, unless he executed the above instruments, he would take immediate possession, and set them all out in the road. Other transactions between plaintiff and the defendant Steckel were had on May 23, 1912, July 5, 1912, September 29 and October 28, 1913.

On the first of the above dates, plaintiff claims that Steckel voluntarily advised him to get the money and pay off the claims in favor of the Blakesburg Bank, the Ottumwa National Bank, and Clara Gamble, and promised to get the money for him; and that he signed an application for a loan ranging from $9,500 to $11,000, the amount to depend upon his necessities after he had ascertained the exact amount due the bank. No papers were executed on July 5th, but the defendant Steckel, his father, John Glosser, and the sheriff, went to plaintiff's premises, at which time the sheriff served on plaintiff some notices regarding a suit in favor of the Savings Bank et al. Plaintiff and defendant also had some conversation and negotiations regarding a suit brought by the guardian of John Glosser, against the plaintiff and others, for the partition of the 359-acre farm involved in this controversy. On September 29th, King, accompanied by the defendant, visited plaintiff at his home; and plaintiff testified that, on this occasion, Steckel told him he had come to help him out,—that the Blakesburg Bank was going to sell him out, slick and clean, —and orally agreed to pay off the judgments and release them of record, and that, for the purpose of securing him therefor, he signed two blank mortgages,—one a real estate mortgage, the other a chattel mortgage,—with the under- standing that Steckel would complete the instruments by filling in the necessary blanks and the description of the

property to be covered thereby. King, who was a notary, took the acknowledgment of the instruments.

Steckel claims that, on the same occasion, plaintiff also signed a contract authorizing him to procure a settlement or assignment of the above judgments, he to have the benefit of any discount he might obtain by the transaction, and in case of his failure to obtain control of the judgments, to procure, if possible, an extension of time for the payment thereof until January 1, 1914, for which latter service plaintiff agreed to pay him $500. A special execution in favor of the Savings Bank, and general executions in favor of the Ottumwa National Bank and Clara Gamble, were levied upon all of plaintiff's real estate, except the homestead forty, on September 27, 1913. The above executions were returned October 9, 1913, unsatisfied, by direction of the judgment plaintiffs.

On October 1, 1913, W. J. Steckel purchased the above judgments for a consideration of $10,250, and on October 28th, plaintiff executed another mortgage to Amos Steckel, trustee, for $14,211.35, to secure the payment of the judgments above referred to,—which, at that time, amounted to $12,322.85,—a note for $1,388.50, and one for $500. This mortgage was not recorded.

On January 24, 1914, in addition to the parties above named, there were present the plaintiff, his sister-in-law, Emma Stocker, a lawyer, by the name of Mitchell, and Gertrude, Henry, and Osa Stocker. At this time, defendant held notes against the plaintiff for the following amounts: $30, $475, $800, $500, $1,388.50 and $12,322.85, the last three being dated September 29, 1913. There was also an unsatisfied judgment against plaintiff in favor of the People's Savings Bank of Blakesburg, for $1,800.

Two instruments, which the defendant Steckel claims to have written at the residence of plaintiff on the night of January 24th, were offered in evidence: one acknowledging

receipt of bill of sale and deeds, and promising to pay plain-
tiff $500, and Emma Stocker $500, on condition that posses-
sion of the farm and personal property be delivered to him
within ten days, and Mitchell & Mitchell, attorneys, $100,
for which a check was delivered to the attorney present;
and the other agreeing to turn over to plaintiff all notes and
mortgages held by him, upon plaintiff's procuring a release
of the lien of the $1,800 judgment. Defendant testified that
he delivered the above papers to Smith,—who denies their
execution or delivery to him,—and testified that defendant
agreed to pay the $1,800 judgment in favor of the Savings
Bank.

On February 7th following, $500 was paid to Smith for
himself, and $500 upon the order of Emma Stocker; and
possession of the premises and personal property was turned
over to defendant about said date.

In the latter part of December, Steckel, according to
the testimony of plaintiff, informed him that he could not
furnish the money with which to pay the judgments, and de-
manded payment thereof; and plaintiff testified that there-
after, his efforts to procure a loan for the purpose of en-
abling him to pay same were defeated, in part at least, by
certain misrepresentations made by Steckel to the loan
agent, regarding the amount of the liens against the land.
Plaintiff also claims that he at all times relied upon the
promises of Steckel to obtain for him a loan with which to
pay his indebtedness. The note for $1,388.50 above referred
to represented an amount which plaintiff claims Steckel
represented to him that he paid to the plaintiff in the parti-
tion suit in settlement thereof; whereas Steckel admitted
that he paid but $545 therefor, but claims to have fully in-
formed Smith thereof before the execution of the note.

Further material facts will be referred to hereafter.

I. Belle H. Steckel, wife of W. J. Steckel, who was
named as grantee in the deeds of January 24th, voluntarily

entered her appearance as a defendant herein and joined in the answer of her codefendants, admitting the execution of the deeds, the written application of May 23d for the loan, the execution of the several notes, mortgages, and other papers offered in evidence, denying all allegations of con-spiracy and duress, and averring that all transactions had with plaintiff were free and voluntary on his part; that full and adequate compensation was paid him for his property; that title to the land was taken in the name of Belle H. Steckel to prevent a merger of the lien of the $1,800 judg-ment in favor of the People's Savings Bank; alleging that plaintiff agreed to pay the same, and that defendant W. J. Steckel, on January 24th, executed a written promise to return all notes and mortgages received from plaintiff, and to cancel all of the remaining judgments upon his procuring release of the $1,800 judgment; alleging that, while the name of grantee was omitted from the bill of sale, the con veyance was for the benefit of W. J. Steckel. Both Herbert King and Belle H. Steckel filed separate answer: the former averring that he had no personal interest in any of the transactions, and that the only relation he sustained to any of the parties was as an employee of W. J. Steckel's; and the latter alleging that the $1,800 judgment cast a cloud upon the title to the real estate, and praying an adjustment of the several matters affecting her title, and that the same be quieted in her.

Defendants also alleged in their answer that a member of the firm of Mitchell & Mitchell, attorneys, of Ottumwa, Iowa, was present during all of the transactions had on January 24th, as attorney for plaintiff, and that whatever was done on that occasion was with his full knowledge and upon his advice, and that plaintiff thereafter ratified the said transactions, and is estopped from asserting any claim against the defendants. Thereafter, defendants moved to transfer the trial of this cause to equity, which motion was

overruled, and defendants complain thereof.  The contention of counsel for defendant is that plaintiff's cause of action is in the nature of a suit for specific performance, which could only be properly brought in equity, and that the disputed matters growing out of the several transactions in question were complicated, and could properly be tried only in equity.  This argument proceeds upon a misconception of the nature of plaintiff's cause of action, which is simply an action based upon damages for the alleged conspiracy and duress.  Plaintiff's title and the lien of the several judgments are in no sense involved.

1. TRIAL: method of trial: duress in execution of deeds: damages.

Duress is a species of fraud, and one who is thereby compelled to convey his property to another, without consideration, or for an inadequate compensation, may resort to the same remedies as a person who has been otherwise defrauded out of his property. *Neibuhr v. Gage,* 99 Minn. 149 (108 N. W. 885) ; *Foote v. De Poy,* 126 Iowa 366; *Welch v. Beeching,* 193 Mich. 338 (159 N. W. 486) ; *Pickler v. Wise,* 152 Iowa 644.

Plaintiff had the right to pursue one of two remedies: that is, to bring a suit in equity to cancel and set aside the instruments upon the ground of fraud and duress, or an action at law for damages.  By his election to bring an action for damages, plaintiff so far ratified the deeds and bill of sale as to completely estop him from thereafter asserting any claim or title to either the personal or the real property.  The motion to transfer to equity was properly overruled.

2. ELECTION OF REMEDIES: right of election: duress: rescission or damages.

II.  The meeting of January 24th was arranged by defendant with the attorney who was present during the negotiations, and who had been employed by plaintiff to assist him in some of his litigation.  Immediately after the exe-

3. FRAUD: actions: duress: trial: jury questions.

cution of the deeds and bill of sale, plaintiff probably assigned his claim to the $500 covered by the contract to Gertie Stocker and plaintiff, and on February 7th, presented the order of both Gertie and Emma Stocker for $500 each, to the defendant, who paid the same, and within the ten days agreed upon, delivered possession of all the property to defendant's representative. The execution of the written agreement to pay plaintiff and Emma Stocker each $500, and $100 to the attorney, is denied by plaintiff, who also denies that he executed the instrument offered in evidence agreeing to pay the $1,800 judgment. The defendant, however, offered in evidence a contract purporting to have been signed by plaintiff, agreeing to pay such judgment and consenting that defendant should have the benefit of any discount he might procure in the purchase of the judgment; and defendant claims that, because of the transactions following January 24th, the plaintiff must be held to have fully ratified all of said contracts.

This question was submitted to the jury under proper instructions, which, in substance, stated that it had a right to take into consideration all of the above matters, in determining whether plaintiff's free agency was overcome and his freedom of choice prevented by the action of defendant, and whether, at the time he delivered possession of the property, he was under the continued influence of the alleged threats of defendant, or whether same was voluntarily and freely done. The question was for the jury. *Callendar Sav. Bank v. Loos,* 142 Iowa 1; *Henry v. State Bank of Laurens,* 131 Iowa 97.

If the deeds and bill of sale were, in fact, obtained by duress, the law presumes, in the absence of testimony to the contrary, that the impelling motive for their execution continued until the final consummation of the transaction, a few days later. *Henry v. State Bank of Laurens,* 131 Iowa 97; *Kwentsky v. Sirovy,* 142 Iowa 385.

III. Testimony was admitted over the

**4. EVIDENCE:**
**relevancy,**
**competency**
**and material-**
**ity; fraud**
**and duress:**
**transactions**
**showing situ-**
**ation, etc.,**
**of parties.**

objection of the defendant as to all of the transactions referred to, the negotiations, the purchase of the several judgments, and the execution of notes and mortgages by the defendant to plaintiff. The court permitted the jury to consider this testimony only for the purpose of showing the situation, the relation of the parties, and the intention and purpose of the defendant Steckel in the various transactions had with the defendant. That this testimony was admissible, in cases of the character under consideration, is familiar, and need not be stated or verified by the citation of authorities.

We find no prejudicial error in the ruling of the court, either in the admission or exclusion of testimony.

IV. Defendant called a witness who had

**5. WITNESSES:**
**impeach-**
**ment: same**
**witness called**
**by both**
**parties.**

previously been examined on behalf of plaintiff. Plaintiff, after proper foundation was laid, was permitted to offer evidence of contradictory statements, for the purpose of impeaching this testimony. Defendant maintains that plaintiff could not impeach his own witness. The ruling of the court was in accordance with the well-recognized ruling and previous holdings of this court. *Hall v. Incorporated Town of Manson,* 99 Iowa 698; *State v. Warner,* 157 Iowa 111.

V. Exceptions were taken by counsel of defendant to many of the court's instructions. Some of the exceptions urged were, in their nature, technical, but, in the main, were directed against the theory upon which the court submitted the case to the jury. We have carefully examined and analyzed the separate instructions complained of, and the charge as a whole, and reach the conclusion that the court correctly defined conspiracy and duress, and stated the elements necessary to constitute the same, together with the matters required to be proven by plaintiff, and that the

same was a clear and correct exposition of the law. It will serve no purpose, and unnecessarily extend this opinion, to consider each instruction and the exceptions thereto in detail.

Counsel also complain of the refusal of the court to give numerous requested instructions. Instructions numbered 22 and 23, asked by defendant, might well have been given by the court; but we think the substance of these instructions were covered by the court's charge, and that it was not prejudicial error to refuse them.

VI. At the request of the defendant, the following special interrogatory was answered by the jury:

6. TRIAL: verdicts: special interrogatories: unsupported answers: effect.

"Did the plaintiff, after having some days to reflect and consider said sale, surrender the possession of the property and receive and retain the $1,000, or part thereof? Answer: No."

Counsel assert that the answer to this special interrogatory is contrary to all of the evidence, including that of plaintiff, and that it, in itself, affords evidence that the jury were influenced by passion and prejudice. Authorities are cited to the effect that a satisfactory finding upon material facts, though not necessarily of a determinative character, contrary to the evidence, is ground for a new trial, and may be evidence of passion and prejudice. *Jeffrey v. K. & D. M. R. Co.*, 51 Iowa 439; *Baldwin v. St. Louis, K. & N. R. Co.*, 63 Iowa 210; *Schulte v. Chicago, M. & St. P. R. Co.*, 114 Iowa 89.

The testimony does show, without conflict, that plaintiff received payment of the thousand dollars which defendant claims was the amount agreed upon, January 24th, to be paid by him, and that, within ten days thereafter, plaintiff surrendered possession of the real and personal property to defendant. It is possible that the jury did not correctly interpret the meaning of the question, and did not understand

the effect of the words, "to reflect and consider said sale."
The court had properly instructed it that if, at the time
plaintiff surrendered possession of the property, he was still
acting under the influence and domination of the threats al-
leged to have been made by the defendant, same would not
amount to a voluntary surrender of the property. The jury
may have believed that an affirmative answer to the ques-
tion would be in conflict with their evident conclusion that
plaintiff was, at the time of surrendering possession of the
property, still acting under the influence of the alleged
threats of the defendant, and that an affirmative answer to
the special interrogatory would not be in harmony with its
general verdict; but in any event, we do not see how the
answer to the question, though erroneous, is indicative of
passion on the part of the jury, and we would not be justified
in reversing this case upon this ground alone.

VII. Some reliance is placed by ap-

7. TRIAL: argu-
ment of coun-
sel: miscon-
duct: incom-
plete record.

pellant upon alleged misconduct of plaintiff
in argument to the jury. The objectionable
remarks of counsel do not appear in the
record, nor is it shown that exception was,
at the time, taken thereto. While attorneys should, in cases
of this character, refrain from the use of language calcu-
lated to inflame the minds of the jury and disqualify them
from rendering an impartial verdict, we cannot reverse
cases on account thereof when the objectionable language is
not set out in the record, and it is not shown to have been
at the time excepted to.

8. FRAUD: ac-
tions: evi-
dence: suffi-
ciency.

VIII. We come now to the question of
whether the verdict of the jury is sustained
by the evidence. It must be confessed that
the amount awarded plaintiff is very large. The testimony
was in conflict upon every material point. The attorney
who was present and took part in the negotiations on Jan-
uary 24th was called as a witness by defendant, whom he

corroborates in detail; whereas the testimony of plaintiff and the witnesses who were present and testified in his behalf was much shaken by cross-examination, and the several versions of what occurred are quite out of harmony in many particulars. The testimony is too voluminous to justify a review thereof in detail, but it is necessary to call attention to a few of the more important parts thereof.

Counsel for appellant moved the court to withdraw both issues of conspiracy and duress from the consideration of the jury, and now insists that a verdict for plaintiff in any sum, and particularly in the large amount found, is wholly unwarranted by the evidence.

Plaintiff seeks to deny the genuineness of his alleged signature to several of the written instruments offered in evidence, but examination of the original exhibits reveals a striking similarity between the disputed and the admittedly genuine signatures. Plaintiff testified that defendant orally promised to obtain a loan for him in sufficient amount to take care of the judgments above referred to, and other pressing indebtedness. This is denied by the defendant. It follows, however, and the jury must have found, that there were negotiations between plaintiff and defendant regarding a loan; but defendant's contention is that he simply took the application and forwarded the same to the representatives of the Mutual Benefit Life Insurance Company, at Davenport, who, for reasons not material at this time, did not make the loan.

Defendant sought to fortify all his dealings with the plaintiff by procuring signed memoranda, or agreements, covering the same. The several visits of defendant to the premises of plaintiff prior to January 24th were unfortunate in point of time. The first was on the occasion when he was served with notice of the several suits brought against him by the National Bank and others. His claimed purpose, on this occasion, was to discuss with the defendant the pur-

chase of whatever interest the plaintiff had in a suit pending
for a partition of plaintiff's farm.   While no contract was
signed at this time, it is admitted that defendant later
settled the interest of the plaintiff in the partition suit for
$545, for which the defendant executed his note for
$1,388.50; but defendant claims that the note was executed
by plaintiff after full knowledge of the facts, whereas plain-
tiff testified that he did not know defendant had obtained
a discount in the settlement of the suit.   The second visit
was on the second day after executions aggregating approx-
imately $12,000 had been levied upon all of plaintiff's farm,
except the homestead forty.   On this occasion, defendant
executed to plaintiff two blank mortgages, with the under-
standing that defendant, upon his return home, would fill in
the necessary blanks and description of the property to be
covered thereby, which was the 359 acres of land and all
of plaintiff's personal property.   This is the occasion on
which plaintiff claims that defendant signed a written in-
strument, consenting that he might settle, or procure an
assignment of the several judgments at such discount as he
was able, and, in the event defendant failed to procure con-
trol of the judgments, to pay him $500 if he procured for
defendant an extension until January 1, 1914, for the pay-
ment thereof.   Shortly thereafter, plaintiff executed notes
and mortgages on his real estate and personal property to
secure the payment thereof in amounts sufficient to cover
the several judgments, $500 for services rendered, and $1,-
388.50, which defendant claims is the amount the partition
suit would have cost plaintiff, in any event.   On January
24th, it is claimed by plaintiff, defendant agreed to pay the
$1,800 judgment in favor of the Savings Bank, but signed
a written agreement consenting that, if defendant could
purchase the judgment at a discount, he might do so.

None of the several judgments were a lien upon the
homestead forty, but the mortgages executed by plaintiff cov-

ered the entire tract, and the deed of January 24th, by specific provision, included plaintiff's homestead interest. Defendant offered testimony upon the trial to that effect, and now contends that the land was not worth to exceed $40 per acre; that it is rough, covered with timber, of exceedingly poor soil, and but a small part thereof is suitable for profitable cultivation.

It is also claimed by plaintiff that the defendant, late in December, notified him that he must have his money; that he was prevented, in part, by the misrepresentations of defendant from obtaining a loan; and that, on the 24th of January, Steckel, King, and Corrick came to his residence at noon, and remained until after midnight, and until the deeds and bill of sale were executed, as plaintiff claims, because of threats to take immediate possession of the premises and personal property and throw plaintiff and the Stocker family into the road.

From the foregoing statement of the testimony, it is apparent that the jury may have found, as the result of the negotiations in question, that defendant derived profits upon the judgments, partition proceedings, and for his services, in a sum approximating $3,000; and that, in addition thereto, defendant conveyed his homestead forty, upon which the judgments were not a lien, and lost his right of redemption from execution sale and to occupy the premises another cropping season, without any profit or advantage of any kind to him from any of the transactions, except the $500 paid on February 7th.

Even if these transactions were to be justified upon the ground of legitimate business, yet the jury may have thought that they were made possible only by inducing a belief in plaintiff that he was, in the end, to profit thereby, to the extent at least of freeing his land from the threat of immediate execution sale, and thereby giving him time within

which to make a further effort to discharge his duty to creditors.

If defendant, at the time he took plaintiff's application for a loan, knew the character and value of plaintiff's land to be as now claimed by him, he must have known that he could not obtain money from the Mutual Benefit Life Insurance Company thereon upon any fair representation of its value, and that whatever promise, if any, he held out to plaintiff, was not justified. If, on the other hand, the land was worth substantially as found by the jury, a loan, by good-faith effort, for the requested amount could doubtless have been procured without great delay.

Proceeding on the theory that the land was not worth to exceed $40 per acre, and knowing the large amount for which plaintiff was indebted to the bank and others, we cannot say there is not some justification for plaintiff's claim that defendant, either because of design or inevitable necessity, knew that, in the end, he would absorb all of the land and personal property of defendant, in payment of the judgments and other indebtedness evidenced by the notes held by him. And the jury may not, in view of these facts, have entertained a very favorable view of defendant's several written contracts, authorizing transactions out of which he was sure of substantial profit, without conferring any corresponding benefit upon plaintiff. Profits accruing to a litigant from speculation in matters which have involved his adversary in serious business distress, from which he is seeking to extricate himself, are not well calculated to challenge either the admiration or friendly acquiescence of a jury.

While the above matters may fall short of proving a conspiracy between Steckel and King, they do tend to throw some light upon the motives and purposes of Steckel in his dealings with Smith. The jury had a right to draw every legitimate inference from all the evidence in the case, and

if, upon any reasonable or legitimate interpretation thereof, it appeared that Steckel, in his dealings with plaintiff, acted with the corrupt purpose and intention of obtaining such a hold upon the property of plaintiff that he could, by threats of the character charged, impel him to execute the papers in question, a verdict in favor of plaintiff for some amount would clearly be warranted. The evidence relied upon to establish the allegations of conspiracy was not very conclusive, and the jury returned a verdict in favor of the defendant King, evidently on the theory that he had not conspired with Steckel to cheat plaintiff out of his property.

Plaintiff's witnesses placed the value of the land at from $60 to $75 per acre, and defendant's, at from $25 to $42.50. The discrepancy in these estimates left a wide margin for the finding of the jury. The court stated the measure of damages to be the difference between the amount paid by defendant, and the fair, reasonable market value of the land. After allowing the indebtedness and all claims of the defendant, the amount awarded is within the average value of the land, as fixed by the several witnesses called by plaintiff. The jury was fully warranted by the evidence in finding that defendant obtained the property in question for an inadequate consideration, and a judgment in some amount might naturally have been expected.

Counsel for defendant sought a reduction in the amount of the verdict in the court below, which was refused; and, notwithstanding the size of the verdict, we cannot, after a careful reading of the entire record, find sufficient support for defendant's claim that same was the result of passion and prejudice.

The credibility of the witnesses and all questions of fact involved were for the jury, and its finding is final and conclusive upon this court; and we cannot, in the absence of such showing as would justify the conclusion that the same is the result of passion and prejudice, disturb the verdict.

IX. Affidavits of five of the jurors, reciting misconduct during the deliberations of the jury, consisting of abuse of the defendant and the method pursued in arriving at the amount of the verdict, were attached to plaintiff's motion for new trial. One of the jurors, in the affidavit attached to defendant's resistance to the motion for new trial, retracted some of the statements contained in his former af- fidavit, and other jurors affirmed that they did not hear the remarks attributed to the juror. The court, upon motion of plaintiff's attorney for that purpose, struck the affidavits from the files. Of this ruling, and of the ruling of the court upon the motion for new trial, on the ground of misconduct of the jury, complaint is made. Most of the matters re- cited in the affidavits inhere in the verdict. We do not think the court committed error in overruling plaintiff's motion for new trial upon this ground.

As before stated, the record in this case is voluminous; but same has been carefully examined, and we reach the con- clusion therefrom that, notwithstanding the large verdict returned by the jury, no reversible error is presented, and the judgment of the lower court must be—*Affirmed.*

GAYNOR, C. J., WEAVER and PRESTON, JJ., concur.